**TOKIO MARINE & FIRE INSURANCE COMPANY, Ltd., Plaintiff-Appellant,**

v.

**RETLA STEAMSHIP COMPANY, Defendant-Appellee.**

No. 23200.

United States Court of Appeals, Ninth Circuit.

May 20, 1970.

Dan Brennan (argued), of Overton, Lyman & Prince, Los Angeles, Cal., for appellant.

Robert A. Fletcher (argued), of Fletcher & Rauch, Los Angeles, Cal., for appellee.

Before CHAMBERS and TRASK, Circuit Judges, and JAMESON *, District Judge.

JAMESON, District Judge:

Plaintiff-appellant, Tokio Marine and Fire Insurance Company, Ltd., as subrogee of R. A. Barnett & Company, the purchaser of a shipment of steel pipe, brought this action against defendant-appellee, Retla Steamship Company,[1] the ocean carrier which transported the pipe from Japan to Los Angeles, to recover damages suffered by Barnett by reason of rust on the pipe when it was delivered in Los Angeles. The case was submitted on an agreed statement of facts. This appeal was taken from a judgment in favor of the defendant, Retla Steamship Company.[2]

Barnett is a California corporation engaged in the importation of steel products, particularly pipe, from Japan. It purchased the pipe involved in this action from Mitsubishi Shoji Kaisha, Ltd., a Japanese exporter of steel pipe and other products. The carrier, Retla Steamship Company, transports cargoes of steel and other commodities from Japanese to United States ports on time-charter ves-

---

\* Honorable William J. Jameson, United States Senior District Judge, Billings, Montana, sitting by designation.

1. The vessel *Thalassoporos*, etc., and others were also named as defendants. By stipulation the action was dismissed with prejudice as to all of the defendants except Retla Steamship Company.

2. The district court exercised its admiralty jurisdiction pursuant to 28 U.S.C. § 1333. This court has jurisdiction pursuant to 28 U.S.C. § 1291.

sels. Mitsubishi, as shipper, delivered to Retla at the Port of Yokohama, Japan, a cargo consisting of steel irrigation pipe and galvanized and ungalvanized plumbing pipe, for carriage to Los Angeles aboard the vessel *SS Thalassoporos*. Retla was the carrier of the cargo within the meaning of United States Carrier of Goods by Sea Act, 49 Stat. 1207, 46 U.S.C. § 1300 et seq.[3]

Retla employed independent tally clerks who counted the cargo and noted on their tally sheets visible wetness or rust. The notations for each lot of cargo were transferred to a mate's receipt, signed by the chief mate of the vessel and the chief checker, and these receipts were delivered to the shipper, Mitsubishi. The original receipts were then presented to Retla's Tokyo office in exchange for the ocean bill of lading. The copies were retained by the shipper.

The tally sheets and mate's receipts contained notations of rust and wetness: "heavy rusty" on all of the irrigation pipe; "white rusty" on all of the galvanized plumbing pipe; "rusty" on the ungalvanized plumbing pipe. All the plumbing pipe also carried the notation "wet before loading".

Appellee issued bills of lading to the shipper. In small print, near the top of each bill of lading, is a statement that the goods were shipped on board "in apparent good order and condition, unless otherwise mentioned in this bill of lading, to be transported subject to all of the terms of this bill of lading". In the lower portion of the front of the bill, close to the place designated for the signature of the agent of the carrier, appears the following provision:

"IN ACCEPTING THIS BILL OF LADING the shipper, consignee and owner of the goods and the holder of this bill of lading expressly accept and agree to all its stipulations, exceptions and conditions, whether written, typed, stamped, or printed on the front or back hereof or incorporated by reference herein, any local customs or privileges to the contrary notwithstanding.

"THE TERM 'APPARENT GOOD ORDER AND CONDITION' WHEN USED IN THIS BILL OF LADING WITH REFERENCE TO IRON, STEEL OR METAL PRODUCTS DOES NOT MEAN THAT THE GOODS, WHEN RECEIVED, WERE FREE OF VISIBLE RUST OR MOISTURE. IF THE SHIPPER SO REQUESTS, A SUBSTITUTE BILL OF LADING WILL BE ISSUED OMITTING THE ABOVE DEFINITION AND SETTING FORTH ANY NOTATIONS AS TO RUST OR MOISTURE WHICH MAY APPEAR ON THE MATES' OR TALLY CLERKS' RECEIPTS."[4]

Mitsubishi did not request a substitute bill of lading pursuant to the foregoing provision. Had Mitsubishi made this request, Retla would have issued a bill of lading "crossing out said definition and setting forth the notations found on the Mate's Receipts."

Under Barnett's purchase agreement with Mitsubishi, the risk of loss and damage passed to Barnett as of the delivery of the cargo to Retla. Barnett paid Mitsubishi after receiving the bills of lading issued by Retla, endorsed by Mitsubishi. Barnett made this payment in reliance on the bills of lading without knowledge of the actual condition of the pipe. Barnett did not inquire what the mate's receipts showed or request the shipper to obtain substitute bills of lading setting forth the notations on the mate's receipts.

It was necessary for Barnett to incur expense in the sum of $3,266 to remove

3. 46 U.S.C. § 1300 provides that, "Every bill of lading or similar document of title which is evidence of a contract for the carriage of goods by sea to or from ports of the United States, in foreign trade, shall have effect subject to the provisions of this chapter." A carrier is defined by 46 U.S.C. § 1301(a) as, "the owner or the charterer who enters into a contract of carriage with a shipper."

4. The portion in capital letters is likewise capitalized on the bill of lading, in larger type than the remainder of the bill.

heavy rust[5] from the irrigation pipe, and the plumbing pipe was depreciated $453.50 because of rust. It was stipulated that, "The rust giving rise to Barnett's loss * * * was rust which existed at the time of the delivery of the cargo to Retla by Mitsubishi at Yokohama, or had developed as a consequence of the rust and wetting present at that time. No act or omission by Retla or any party for whose action or omission Retla is responsible caused or contributed to the rusting of the pipe."

In light of the court's finding, based on the agreed statement of facts, that Retla was not responsible for the rust, the trial court first concluded:

"Defendant (Retla) is liable to Plaintiff only if Defendant is estopped by the Bill of Lading issued by it from showing that the goods were rusty and in part wet when received by Defendant. The principle involved is the following: when an ocean carrier issues a Bill of Lading, which, to its knowledge, falsely represents the apparent condition of the goods, the carrier is estopped to contradict the representation as against a party which purchased the cargo in reasonable reliance on the representation in the Bill. If the Bill makes no representation, there is no estoppel." (Conclusion I).

Appellant does not question the foregoing conclusion, but contends that the court erred in all of its remaining conclusions, which may be summarized as follows:

By reason of the provision in the bill of lading in capital letters (quoted

supra), the "Bills issued by Defendant made no representation one way or the other as to the condition of the cargo with respect to rust or moisture" and "do not form the basis for an estoppel."[6] (Conclusion II).

The provision in 46 U.S.C. § 1303 (3) "that the carrier 'shall, *on demand of the shipper* issue to the shipper a bill of lading showing * * * the apparent order and condition of the goods'" (emphasis in original) does not require a statement in the absence of a demand by the shipper, and under the facts of this case, "Defendant did not violate any duty owed by it under COGSA." (Conclusion III).

The clause in the bill of lading restricting its statement of apparent good order and condition is not invalidated by 46 U.S.C. § 1303(8)[7] or by the principle announced in decisions dealing "with attempts by a carrier in its bill of lading to eliminate or reduce its liability for damage which it has done or permitted while the goods were in custody". (Conclusion IV).

In order to place liability upon defendant it would be necessary to conclude that because defendant "made no statement of the apparent order and condition of the goods one way or the other with respect to rust", it "is to be treated as if it had made a false statement" and that "Barnett had relied on such false statement"; and this "conclusion does not follow from that premise". (Conclusion V).

46 U.S.C. § 1303(4) provides "that a bill of lading shall be prima facie

---

5. Heavy rust must be removed prior to the sale and use of steel products. Slight atmospheric rust comes off in the manufacturing process and does not constitute damage.

6. Citing Nichols & Co. v. Steamship Isla de Panay, 1925, 267 U.S. 260, 45 S.Ct. 269, 69 L.Ed. 603; and Canada and Dominion Sugar Company, Ltd. v. Canadian National (West Indies) Steamships, Ltd., 1947, A.C. 46, 80 Ll.L.L.Rep. 13 (Privy Council), discussed *infra*.

7. Section 1303(8) provides:
 "Any clause, covenant, or agreement in a contract of carriage relieving the carrier or the ship from liability for loss or damage to or in connection with the goods, arising from negligence, fault, or failure in the duties and obligations provided in this section, or lessening such liability otherwise than as provided in this chapter, shall be null and void and of no effect."

evidence of the receipt by the carrier of the goods 'as therein described' ", and since the bills of lading "issued by Defendant do not describe the condition of the goods with respect to rust or moisture, they are not even prima facie evidence of such condition" and "provide no basis for an estoppel". (Conclusion VI).

Appellant contends that the "rust clause" is invalid; that the defendant carrier in effect represented the cargo to be in "good order and condition" and Barnett had a right to rely upon that representation; and that the bill of lading is tantamount to a "clean bill", estopping appellee from denying that the "cargo was damaged when placed on board".

Appellee contends, as the district court found, that the bill of lading, read as a whole, makes no representation at all with respect to rust or moisture; that the provision negativing any representation on that subject was placed in large, clear type where it could not be missed by anyone who looked at the bills; that the clause gives notice to anyone receiving the bills that the cargo may or may not have been delivered in rusty or wet condition and that there were receipts by mates or tally clerks, which may or may not contain notations as to rust or moisture; and the reasonable reliance required for estoppel is absent.

Do the bills of lading form a basis for estoppel? The answer to this question depends primarily upon the construction and effect of the two provisions quoted supra, i. e., the clause that the goods were shipped on board "in apparent good order and condition, unless otherwise mentioned in this bill of lading", and the provision in bold type that the "term 'apparent good order and condition' * * * does not mean that the goods, when received, were free of visible rust or moisture", coupled with the provision that "if the shipper so requests, a substitute bill of lading will be issued * * * setting forth any notations as to rust or moisture which may appear on the mates' or tally clerks' receipts."

Where a carrier issues a bill of lading which makes no representation with respect to the order and condition of the cargo, the carrier is not as a general rule estopped from showing that any damage was of preshipment origin. This rule was clearly established in Nichols & Co. v. Steamship Isla de Panay, supra. In that case, olives packed in wooden containers were loaded on board ship in Spain. When the cargo was discharged in New York the casks were badly damaged. No negligence in the loading or unloading was shown. It did appear from the evidence that the carrier was aware of the weak condition of the casks and refused to accept the cargo until shippers guaranteed that they would assume responsibility for any breakage. The carrier issued a clean bill of lading which "said nothing concerning order or condition of the merchandise and contained exemption clauses" ignoring weight and contents. 267 U.S. at 267, 45 S.Ct. at 270.

In holding that the carrier was not liable, the Court said:

"In the present case the bills of lading were issued as agreed by the parties—no demand was made for bills with different recitals. According to the long-established rule, bills like those before us do not affirmatively represent good order and condition (Atchison, T. & S. F. Ry. Co. v. Harold, 241 U.S. 371, 36 S.Ct. 665, 60 L.Ed. 1050), and we find nothing in the Harter Act which requires that they be given a different effect, either through construction or by estoppel.

"Higgins v. Anglo-Algerian S.S. Co. (2 Cir. 1918, 248 F. 386), is essentially different from the present cause. There the bill of lading expressly recited that the merchandise had been received in good order and condition; and the ship was seeking to escape liability by setting up its own wrongful action." (267 U.S. at 273, 45 S.Ct. at 272).

It is true, as appellant argues, that Panay was decided under the Harter Act, 46 U.S.C. § 190 et seq., prior to the

enactment of the Carriage of Goods by Sea Act, 46 U.S.C. § 1300 et seq. The latter act was "lifted almost bodily from the Hague Rules of 1921, as amended by the Brussels Convention of 1924, 51 Stat. 233." Herd & Co. v. Krawill Machinery Corp., 1958, 359 U.S. 297, 301, 79 S.Ct. 766, 3 L.Ed.2d 820. It embodies "substantially the provisions of the earlier Harter Act, * * *". Scarburgh v. Compania Sub-Americana De Vapores, 2 Cir. 1949, 174 F.2d 423, 424. Under the Harter Act, 46 U.S.C. § 193, the owner of a vessel is required to issue a bill of lading "stating, among other things * * * apparent order or condition" of the shipment. This is essentially the same as §§ 1303(3) (c) and (4), except that the latter requires the bill of lading only "on the demand of the shipper". The rule set forth in Panay is applicable.[8]

It is clear of course that in Panay there was no representation whatever as to the condition of the cargo. Panay accordingly does not resolve the question of whether the recital in the bills of lading in this case constitutes an affirmative representation of apparent good order and condition, in view of the definition of "apparent good order and condition" contained in the so-called "rust clause".

The only case cited by either party which has considered a comparable situation is the English decision in Canada and Dominion Sugar Company, Ltd. v. Canadian National Steamships, Ltd., supra.[9] In that case plaintiff had purchased sugar relying on a bill of lading. The sugar was found to have been damaged prior to shipment. The ship's receipt, signed by the chief tally clerk as agent for both the shipper and carrier, contained the notation "many bags stained, torn and resewn". This notation did not appear on the bill of lading, which stated, in the first line, that the goods were "received in apparent good order and condition". A stamped clause in the margin stated that the bill of lading was "signed under guaranty to produce ship's clean receipt". The Privy Council, affirming the Supreme Court of Canada, held that the bill of lading provided no basis for estoppel.

After holding that had the statement "Received in apparent good order and condition" stood alone, the bill would have been "clean", the court concluded that the stamped endorsement qualified the bill, making it "clear and obvious on the face of the document and reasonably conveying to any businessman that if the ship's receipt was not clean the statement in the bill of lading as to apparent order and condition could not be taken to be unqualified." 1947 A.C. at 54. The court continued:

"A question now of estoppel must be decided on ordinary common law principles of construction and of what is reasonable, without fine distinctions or technicalities. On that basis the language of the bill of lading, read fairly as a whole, is not * * * such as to found an estoppel.

"* * * But the whole case of estoppel fails if the statement is not sufficiently clear and unqualified. * * * The appellants fail to justify their construction of the bill of lading, and accordingly their claim fails." 1947 A.C. at 55, 56.

 As in the Canada and Dominion case, the bills of lading here, "read fairly as a whole", show that the term "good order and condition" was qualified by the clause defining the term with respect to

8. In effect appellant urges here the position taken in the dissenting opinion in Panay.

9. The statute before the Privy Council was the Carriage of Goods by Sea Ordinance of British Guiana, which is essentially the same as COSGA. Both acts are statutory enactments of the same Hague Rules, as amended by the Brussels Convention. "The effort of those Rules was to establish uniform ocean bills of lading to govern the rights and liabilities of carriers and shippers inter se in international trade." Herd & Co. v. Krawill Machinery Corp., 359 U.S. at 301, 79 S. Ct. at 769, supra.

iron, steel or metal products. The qualifying provision in Canadian and Dominion was stamped or endorsed on the margin of the bill of lading. Here the qualifying provision was a part of the bill itself. The term "apparent good order and condition" was followed by the clause "unless otherwise mentioned in this bill of lading". Immediately above the "rust clause" is a paragraph wherein the shipper, consignee, and holder of the bill expressly accept and agree to all of the stipulations, exceptions and conditions" found in the bill of lading. The rust clause in capital letters [10] specifically recites that the "term 'apparent good order and condition' * * * does not mean that the goods, when received, were free of visible rust or moisture" and provides for a substitute bill if that information is requested. The consignee, Barnett, an experienced importer of iron and steel products, could not reasonably rely upon this qualified statement as an affirmative representation that the pipe was free from rust or moisture when it was received by the carrier. Appellee was not estopped to deny liability.

 We find nothing in the United States Carriage of Goods by Sea Act which would render invalid the qualifying clause defining the term "good order and condition" as applied to iron and steel products. As noted supra, the requirement of 46 U.S.C. § 1303(3) (c) that the carrier shall on demand of the shipper issue a bill of lading showing, among other things, the "apparent

order and condition of the goods" is less stringent than the comparable provision in the Harter Act, under which the Supreme Court held in Panay that there was no liability where the carrier did not "affirmatively represent good order and condition".

There is no evidence that the shipper here ever demanded bills of lading showing apparent order and condition. It is expressly stipulated that it did not demand substitute bills pursuant to the "rust clause". Construing the same statutory provision in Canada and Dominion, the Privy Council held that the clause "did not make it imperative for the carrier to issue a bill of lading save on demand of the shipper. There is indeed no law which prevents goods being carried at sea without any bill of lading at all (citation omitted) or makes any particular form of the bill of lading obligatory. It seems clear that the bill of lading here was what the parties intended and was in no sense unlawful or void." [11] 1947 A.C. at 57.

It is true, as appellant contends, that the rust damage suffered here was not within the exemptions provided in 46 U.S.C. § 1304. Specifically, heavy rust does not come within section 1304(2) (m) which provides: "(2) Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from—* * * (m) Wastage in bulk or weight or any other loss or damage arising from inherent defect, quality, or vice of the goods; * * *". This clause has been restricted to "light atmospheric

---

10. This is not a case where the qualifying clause is buried in fine print. On the contrary, it is the most conspicuous and prominent provision on the face of the bill of lading.

11. See also Poore on Charter Parties and Ocean Bills of Lading, 5 ed. 1968, Sect. 64, pp. 159, 164, where, after reviewing 46 U.S.C. § 1303(3) the author states:
 "The feature to be emphasized in the above part of the Act is that such a bill of lading is to be used only 'on demand of the shipper.' If the shipper accepts a bill of lading which does not

show all the particulars listed, the document is entirely valid; the shipper need not insist upon everything mentioned. In fact, if the shipper does not furnish the particulars in writing in due season, he is not entitled to have them stated in the bill of lading. If the shipper accepts a bill of lading which does not show the 'apparent order and condition of the goods' the carrier is not guilty of any wrong, and cannot be held responsible for misrepresentations of the conditions of the goods." (citing Canada and Dominion Sugar v. Canadian National Steamship, Ltd., supra).

rust", not the heavy "flaky rust" suffered here.[12] The fact that this section of the Act is not applicable, however, does not render invalid the qualifying clause relating to "visible rust or moisture".

Also distinguishable is Spanish-American Skin Company v. The Ferngulf, 2 Cir. 1957, 242 F.2d 551, affirming the decision of the District Court of the Southern District of New York, 1956, reported at 143 F.Supp. 345. In that case the bill of lading expressly set forth the number of packages and weight. The bill also bore a rubber-stamp imprint "Steamer not responsible for weight, quality or condition of contents." The court held that the statement of weight in the bill of lading was prima facie evidence of the weight received and that the carrier could not in this manner avoid liability for false information given by the shipper. The district court pointed out, however, that the carrier "does not have to put such statements in the bill of lading", but if he does put them in, "he, in effect, assumes responsibility therefor * * *." 143 F.Supp. at 350. In the instant case it is apparent from the bill of lading itself that the carrier has not stated the apparent good order and condition with respect to rust and moisture.

Finally, appellant argues that the qualifying "rust clause" is invalid under 46 U.S.C. § 1303(8). That subsection of the Act renders invalid any clause or covenant "relieving the carrier * * * from liability for loss or damage * * * arising from negligence, fault, or failure" in the performance of duties imposed by the Act. It is expressly stipulated that "[n]o act or omission" of appellee "caused or contributed to the rusting of the pipe." Section 1303(8) is not applicable. The cases cited by appellant in support of this contention are likewise distinguishable.[13] They were concerned with situations where the carrier sought to relieve himself from liability for damage which developed during carriage. None involved preshipment damage.

Affirmed.

---

12. The cases upon which appellant relies involved the liability of the carrier for damage while the cargo was in its custody. They hold that the statutory exemption applies only to light atmospheric rust and that the carrier has the burden of proving that excessive rust occurred without fault or negligence of its servants or agents. See Copco Steel & Engineering Co. v. The Prins Frederik Hendrik, E.D.Mich.1955, 129 F.Supp. 469; Copco Steel and Engineering Co. v. S. S. Alwaki, S.D.N.Y.1955, 131 F.Supp. 332; Copco Steel & Engineering Co. v. The Prins Willem Van Oranje, E.D.Mich.1957, 159 F.Supp. 79, 87.

13. Appellant relies upon cases cited in Note 12 and Jones v. The Flying Clipper, S.D.N.Y.1953, 116 F.Supp. 386; Standard Brands, Inc. v. Thos. & Jno. Brocklebank, Ltd., S.D.N.Y.1948, 81 F.Supp. 670; Wessels v. The Asturias, 2 Cir. 1942, 126 F.2d 999.