**DORSID TRADING COMPANY,**
Plaintiff,

v.

**SS ROSE, Her Engines, Tackle, etc., et al.,**
Defendants.

**Civ. A. No. 69-H-571.**

United States District Court,
S. D. Texas,
Houston Division.

May 18, 1972.

Michael S. Wilk, Hirsch, Westheimer & Block, Houston, Tex., for plaintiff.

Theodore Goller, Fulbright, Crooker & Jaworski, Houston, Tex., for Retla Steamship Co.

Robert C. Davee, Eastham, Watson, Dale & Forney, Houston, Tex., for Maru Shipping Co., Ltd.

## MEMORANDUM AND ORDER

CARL O. BUE, Jr., District Judge.

The plaintiff, Dorsid Trading Company, brought this suit against the SS ROSE, its owners and charterers, to recover the sum of $27,512.68 as damages caused by rust, bending and shortages to a shipment of mild steel plates carried on board the SS ROSE from the Port of Hirohata, Japan, to the Port of Houston, Texas, under Bills of Lading Nos. 1 through 20, from May to July, 1968.

The plaintiff is a Texas corporation engaged in business as an importer of steel products from Japan and other nations for distribution and sale to the wholesalers of steel products in the Houston area. The defendant Retla Steamship Company, a California corporation, is engaged in the business of carrying cargoes of steel, plywood and other commodities from ports in Japan to ports in the United States, including the Port of Houston, on vessels time-chartered by it for that purpose. Retla was a carrier of the cargo involved in this action within the meaning of the United States Carriage of Goods by Sea Act, 46 U.S.C. § 1300 et seq., and the ocean carriage involved in this action is subject to that Act. The defendant Maru Shipping Co., Ltd. is the owner and operator of the SS ROSE. This Court has jurisdiction of the parties and subject matter of this suit pursuant to 28 U.S.C. § 1333.

Early in 1968 Commercial Metals Company, a corporation with offices at Dallas, Texas, entered into a contract for the purchase of a quantity of steel plate [hereinafter called Dorsid plate] then owned, or to be purchased, by a Japanese firm known as Hanwa Co., Ltd., Osaka. As a part of the contract price, Hanwa agreed to deliver the plate to Houston and to arrange for and pay the ocean freight, customs duties, and insurance for the cargo during transportation.

Pursuant to Hanwa's arrangements, the Dorsid plate was delivered by rail to the Port of Hirohata, Japan for loading aboard three vessels: the BUKO MARU, the GOLAR ARROW and the ROSE. Late in April, 1968, the ROSE arrived in Hirohata, the vessel's first loading port. A stevedore employed by Retla loaded the Dorsid plate in question aboard the ROSE, where it was stowed on a dunnage floor across the forward part of the bottom of the No. 2 and No. 4 holds. Steel plate other than Dorsid

plate was also loaded in the same holds and adjacent to the Dorsid plate.

Some attempt appears to have been made to cover the Dorsid plate while it was on cars prior to loading aboard the ROSE. However, at the time it was loaded, much of the plate was wet to some degree and all had rust on the flat surfaces of the top and bottom plate of each lift and on the edges of all plate. Cargo checkers employed by Retla Steamship Company and supervised by the chief mate of the ROSE observed the condition of the Dorsid plate as it came aboard the ship. Notations were made on the face of the Shipping Orders or Mate's Receipts as to the actual condition of the plate regarding rust (Retla exh. R–3). Such notations were also included in the exception list of the Japan Cargo Tally Corporation, an independent contractor engaged to tally the cargo. (Retla exh. R–2).

No exceptions or notations were made as to shortages and bending, and it is presumed that the number of steel plates acknowledged by the bills of lading were accounted for and were free of bends and crimps.

The Court finds that the clauses in the Shipping Orders and the exceptions contained in the Japan Cargo Tally Corporation exception list properly reflect the condition of the cargo at the time of loading. Whether due to semantic difficulties or to actual differences of expert opinion, this condition has been variously described by those who viewed the steel, both at the time of loading and at discharge some months later. The Court finds that, at the time of loading, the rust was of atmospheric origin and was insufficient in degree to cause any reduction in commercial value.

On April 30, 1968, Retla issued Bills of Lading HH–1 through HH–20 on its printed form to the order of Hanwa Co., Ltd., Osaka, covering the Dorsid plate. The bills of lading recited in a printed paragraph near the top that there had been shipped on board the vessel:

the goods . . . hereinafter mentioned, in apparent good order and condition, unless otherwise mentioned in this bill of lading . . . .

In the lower left-hand corner of the bill of lading, adjacent to the space provided for signature, appeared the following language in large type:

IN ACCEPTING THIS BILL OF LADING, the shipper, consignee and owner of the goods and the holder of this bill of lading expressly accept and agree to all its stipulations, exceptions and conditions, whether written, typed, stamped, or printed on the front or back hereof or incorporated by reference herein, any local customs or privileges to the contrary notwithstanding.

THE TERM 'APPARENT GOOD ORDER AND CONDITION' WHEN USED IN THIS BILL OF LADING WITH REFERENCE TO IRON, STEEL OR METAL PRODUCTS DOES NOT MEAN THAT THE GOODS, WHEN RECEIVED, WERE FREE OF VISIBILE RUST OR MOISTURE. IF THE SHIPPER SO REQUESTS, A SUBSTITUTE BILL OF LADING WILL BE ISSUED OMITTING THE ABOVE DEFINITION AND SETTING FORTH ANY NOTATIONS AS TO RUST OR MOISTURE WHICH MAY APPEAR ON THE MATES' OR TALLY CLERKS' RECEIPTS.

There was no evidence that the shipper requested Retla to issue a substitute bill of lading crossing out the definition quoted immediately above [hereinafter referred to as the Retla Clause] and setting forth the notations as to rust or moisture appearing on the Mate's Receipts.

Prior to the arrival of the SS ROSE in Houston, the bills of lading and cargo carried thereunder were purchased by Commercial Metals in a joint venture with Dorsid Trading Company. Risk of loss or damage to the cargo passed to the joint venturers as of the time of de-

livery to the SS ROSE. This suit was brought by Dorsid Trading Company with the consent of its co-venturer [hereinafter collectively referred to as Dorsid]. Dorsid did not inquire of its predecessor in title as to notations on the Mate's Receipts, nor did it request its predecessor to obtain substitute bills of lading omitting the capitalized definition and setting forth the notations appearing on the Mate's Receipts and/or tally clerk's exception list.

After the Dorsid plate was loaded at Hirohata, the ROSE [1] loaded additional cargo, including steel products, lumber and plywood, at Tobata and Kawasaki, Japan and at Inchon, Korea. Some of this cargo was stowed in the No. 2 and No. 4 holds above the Dorsid plate. Both holds were filled with cargo. The hatches were closed during periods of rain, and no appreciable or significant rain or moisture entered the holds during such loading periods. All cargo was properly and carefully loaded and stowed. After completion of all loading, the vessel sailed for Houston. The voyage from Japan to Houston was uneventful, except for a few days of rain and heavy weather.

No significant dispute remained at the time of trial as to possible rust damage caused by exposure of the plate to sea water, it being generally conceded by the plaintiff that the laboratory tests conducted revealed no indication of salt water contamination.[2] The contention as to rust damage caused by rain, sweat or condensation remains hotly contested,

both as to the extent of damage, if any, and the time and place such damage occurred. The Court finds that the vessel did not leak in any way and that there was no entry of sea water and no significant entry of fresh water into any of the vessel's holds. The Court further finds that the ventilation system for the cargo holds of the ROSE was in good order, was adequate, and was operated to obtain maximum efficiency and ventilation. The ROSE was in all respects seaworthy and reasonably fit for the carriage of steel products, and the Dorsid plate aboard the ROSE was not damaged by sweat or condensation during the voyage.

Upon arrival of the SS ROSE at its berth in Houston, representatives of Retla, Mr. Warren Olsen and Mr. David Swearengin, went aboard and made a preliminary inspection of the cargo in each hold immediately after the hatch covers were opened. The purpose of their inspection was to determine whether the cargo had sustained damage during ocean transit, such as, for example, the entry of sea water into the holds. Retla's representatives found no evidence of hatch leakage or lack of watertight integrity of the Nos. 2 and 4 holds in which the cargo made the basis of this suit was stowed.[3]

From July 1 to 3, 1968, the steel plates were discharged in Houston into gondola type rail cars and motor trucks for carriage and delivery to Dorsid Trading Company or its receivers. The evidence shows that the rail cars in

---

1. The M/V ROSE is a steel ocean going cargo vessel built in Japan in 1964. The vessel is a typical bulk carrier with her engines and superstructure located aft of five cargo holds. There are no 'tween decks in any of the holds.

2. Plaintiff exh. 11, inspection and analytical report of McWaters Marine Laboratory, by Mr. McWaters. *See also* testimony of Captain Salter, and Mr. O'Keefe, marine surveyors, and Mr. Olsen, an employee of Retla. However, Mr. Slavin, president of Dorsid, testified as to his continued belief that salt water contamination occurred, based largely upon the survey report of Captain Wynne, which

report this Court views as erroneous, after considering all of the proof adduced at the trial. This evidence is discussed more fully, *infra*, in this opinion.

3. This Court is well aware that these Retla employees are interested parties in this suit. However, in weighing the testimony and determining credibility, it should be remembered that Retla's examination was to gather information not only for the purpose of protecting against claims by cargo, but also for instituting claims over against Maru Shipping, which was responsible for providing a seaworthy vessel.

many cases contained standing water, some as deep as two to three feet, as well as dirt and debris of unknown origin. During the period involving inland transportation to Dorsid's premises the steel plates were subjected to heavy and continued wetting by rain.

Dorsid gave timely preliminary notice of intent to file claim on July 3, 1968. On July 22, 1968, notices of survey were mailed to the defendants. Notwithstanding the notice, no representative or surveyor for the vessel, its owners or charterers, was present. The survey was held at the premises of Consolidated Bonded Warehouses, Inc., which are also the premises of Dorsid, on August 26, 1968. In attendance were Mr. O'Keefe[4] of J. R. Bencal & Associates, surveyor for the account of the cargo underwriter, and Captain Wynne, surveyor for the account of Dorsid.

Several weeks prior to the survey, in early July, a chemist, Mr. Lynn McWaters, was engaged by Dorsid to conduct laboratory tests on water samples and rust scrapings taken from the plates at both the dock and at the warehouse in order to determine the source of the rust condition. Mr. McWaters' report[5] shows, and he so testified, that the samples he analyzed did not show evidence of sea water wetting. McWaters' report was issued July 16, 1968, prior to the survey, and he informed Mr. Slavin of his opinion that there was no evidence of sea water contamination prior to the survey.

Captain Wynne's survey report[6] reflects rust on 1,068 pieces of steel plate, and bending damage to 47 pieces of plate. His opinion was that the rust was caused by salt water, presumably sea water, contamination, aggravated by rains. He noted that Mr. McWaters' report indicated insufficient chlorides to evidence such contamination, but he theorized that the rains to which the steel had been subjected had leached most of the chlorides from the steel. Captain Wynne reported bending damage as caused by "rough handling prior to having been received into the warehouse at the Dorsid" yard, and further maintained that the character of bending found indicated its probable cause as loading in or discharge from the ROSE. Both Mr. Slavin and Captain Wynne admit that there was no pitting and no scaling due to rust on any of the plates.

Mr. O'Keefe found that the plate had only normal atmospheric rust incident to ocean carriage aggravated by exposure to rain in the rail cars. His tests for chlorides were uniformly negative. He concluded that the rust did not cause damage and that the value of the plate was undiminished by reason of such rust.

Mr. O'Keefe agreed with Captain Wynne and Mr. Slavin that a reasonable estimate of the cost of cleaning the allegedly damaged plate to the bare metal so that every trace of rust and mill scale would be removed would vary from $15 to $30 per net ton including the costs of handling and transportation of the plate to and from the premises of a company skilled in such work. However, Mr. O'Keefe testified and the preponderance of the evidence in this case showed that the plate was marketable at prime prices in its condition at the time of the survey, and that no cleaning or reconditioning was necessary.

The Court finds Mr. O'Keefe's testimony to be correct and his conclusions accurate. There was rust on the Dorsid plate, some of which predated the carriage of the plate aboard the ROSE, and some of which was caused or aggravated by exposure to rains and standing water in rail cars subsequent to discharge. The plate was moist upon discharge, and there was a small amount of water lying in an indentation in the floor of one of the holds. This moisture

---

4. Mr. O'Keefe did not receive specific notice of the survey until August 13, 1968.

5. Plaintiff's exh. 11.

6. Plaintiff's exh. 10a, summary of deposition of Captain Wynne on direct examination, and 10b, survey report of Captain Wynne.

is attributable to condensation which resulted when the warm, humid air in Houston came into contact with the cooler steel plate in the hold during the course of discharge. Such condensation was unavoidable according to the preponderance of the evidence in this case. However, this condensation was not the cause of any damage to the Dorsid plate. At the time of discharge the rust on the flat surfaces and the edges of the plate was nothing more than the normal light, atmospheric rust which inevitably occurs during ocean carriage and the normal progression of atmospheric rust which was present on the steel at the time of loading.

This rust is an inherent vice of the goods for which the carrier and the ship are exempt under COGSA § 1304(2)(m), Copco Steel & Engineering Co. v. The Prins Willem Van Oranje, 159 F. Supp. 79, 87 (E.D.Mich.1957). See Copco Steel & Engineering Co. v. S/S ALWAKI, 131 F.Supp. 332 (S.D.N.Y. 1955); Copco Steel & Engineering Co. v. The Prins Frederik Hendrik, 129 F. Supp. 469 (E.D.Mich.1955). Although the Court has found that the atmospherically rusty condition of the steel plates constituted an inherent vice of the cargo, it did not constitute a condition of damage, Tokio Marine & Fire Ins. Co. v. Retla S.S. Co., 426 F.2d 1372, 1375 n.5 (9th Cir. 1970), even at the time of survey after being aggravated by rain and standing water.

There was testimony to the effect that the employees of Consolidated Bonded Warehouse Company, another of Mr. Slavin's wholly owned companies, may have cleaned some of the plates by wire brushing or sweeping before shipment to Dorsid's customers over a period of more than a year until the last of the shipment was sold. However, such testimony was completely unsupported by evidence as to the identity of such employees, the dates they allegedly worked, the supplies expended or of any expenditures whatsoever in connection with such alleged cleaning. Further, the evidence showed that if any such cleaning

was in fact done, it was done by the regular employees of Consolidated Bonded Warehouse Company in the course of their regular duties. Accordingly, this Court finds that the plaintiff has failed to prove the expenditures of any sums to recondition this cargo or any damages suffered by reason of the rust on the plates.

The plate was sold in small lots by Dorsid over a period of almost a year following the survey at the Dorsid yard. Dorsid stipulated during the trial that it received the full market price for the plate, with no diminution because of rust.

Some of the plate included in bills of lading HH–1 through HH–20 was sold by Dorsid prior to the arrival of the ROSE in Houston. Other portions of the plate were sold after discharge from the ship, but before delivery to the Dorsid yard. It is interesting to note that no claims were pressed for rust damage on any of the cargo carried in the ROSE during the voyage in question except for the Dorsid claim on the plate it received at its yard.

Inasmuch as the Court has found that no rust damage has been proved, this next issue is non-determinative of the suit. However, the policy considerations raised in this regard merit some comment.

The plaintiff, in addition to alleging damage caused by rust, contends that the Retla clause, quoted supra, which appears at the bottom of the bills of lading under which the Dorsid plate was shipped, is invalid under COGSA for two reasons: (1) the Retla clause tends to lessen the carrier's liability for loss or damage to goods arising from the fault of the carrier, and (2) COGSA requires that if a negotiable bill of lading is issued, the bill must state the apparent order and condition of the cargo covered by such bill. Thus, it is urged that the defendants should be estopped from showing the actual condition of the cargo at the time of loading as reflected by the notations on the tally clerk's excep-

tion list and the Mate's Receipts. Plaintiff contends further that, even if the Retla clause is valid, its inclusion creates an ambiguity in the bill of lading issued by Retla, and therefore such a bill must be construed as a whole as representing that the cargo covered thereby was in apparent good order and condition when received by the carrier.

 The applicable portion of COGSA, 46 U.S.C. § 1303(3) provides:

(3) After receiving the goods into his charge the carrier . . . shall, *on demand of the shipper,* issue to the shipper a bill of lading showing among other things—

. . . . . .

(c) The apparent order and condition of the goods . . . . (emphasis added)

It is evident that this language does not require the carrier to state the apparent order and condition of the cargo except when so demanded by the shipper. Thus, a bill which is limited or qualified in its statement as to the apparent condition of the goods is not in violation of COGSA unless a complete statement is demanded. *See* W. Poor, Charter Parties and Ocean Bills of Lading § 64 at 160 (5th ed. 1968). Nor can such a bill, qualified by the Retla clause and thus containing no representations with respect to rust and moisture conditions of the cargo, be made the basis of an estoppel, Tokio Marine & Fire Ins. Co. v. Retla S.S. Co., 426 F.2d 1372, 1376 (9th Cir. 1970). *See also* Nichols & Co. v. Steamship ISLA DE PANAY, 267 U.S. 260, 273, 45 S.Ct. 269, 69 L.Ed. 603 (1925).

Plaintiff also contends that the Retla clause is invalid under 46 U.S.C. § 1303(8), which subsection renders invalid any clause or covenant "relieving the carrier . . . from liability for loss or damage . . . arising from negligence, fault, or failure" in the performance of duties imposed by COGSA. Seemingly, the plaintiff reasons that the Retla bill of lading amounts to a clean bill (with respect to rust and moisture)

without the benefit of the prima facie presumption that attaches to a clean bill —that the carrier received the goods in apparent good order and condition. Thus, it is argued that the carrier lessens his liability by changing the burden of proof.

 This contention must fail. Section 1303(8) deals only with the carrier's liability for damage caused by its own fault during carriage. It has no application to preshipment or prereceipt damage. Furthermore, section 1303(4) provides that the bill of lading is prima facie evidence of receipt of the goods *as described* in the bill of lading. Since the Retla bill specifically provides that *no description* of rust condition or moisture is included unless requested, section 1303(4) is likewise inapplicable to that extent. Of course, if a proper request were made, a substitute bill of lading would be issued setting forth any notations as to rust or moisture which appeared on the Mate's Receipts. Thus, claimant's benefits under section 1303(4) could be revived simply by request.

 This Retla clause, which appears in all of Retla's regular printed bills of lading, has been held valid under COGSA in a probing opinion by Judge Jameson, writing for the Court in Tokio Marine & Fire Ins. Co. v. Retla S.S. Co., 426 F.2d 1372 (9th Cir. 1970). This Court is in agreement with this decision that the Retla clause is valid and creates neither estoppel nor ambiguity.

One aspect of this issue merits mention by the Court, even though it is not controlling. The testimony of Merle R. Crocker, International Banking Department of the Bank of the Southwest, Houston, and Jerry L. Holmes, vice-president and manager of International Banking Services, Republic National Bank of Dallas, reflects that a "Retla clause bill" would be, by banking and commercial practice, designated as a clean bill of lading. Thus, a letter of credit requiring by its terms a clean bill would be honored upon presentation of a

Retla clause bill. This practice thwarts the very safeguard that letters of credit are meant to impart; that is, the actual receipt of goods in a specified order and condition.

Moreover, it is worthy of note that prevention of this undesirable result by requesting a substitute bill is perhaps a less realistic alternative than might be initially assumed. Often the cargo claimant is a consignee of cargo who is not a party at interest at the time of the original contract between the shipper and the carrier. Since the Retla clause bill of lading is advantageous to both the shipper of cargo and the carrier, there is little likelihood that such a request will be made. It is fair to state, then, that the consignee of cargo might be placed ultimately in a more difficult position through use of this type of bill of lading. However, this aspect alone does not persuade this Court that the Retla clause should be held invalid under COGSA. Instead, the guiding principles to be applied are those capsuled in *Tokio Marine*, discussed *supra*.

■ In addition to claims made for alleged rust damage, plaintiff has alleged that 43 plates out of the total shipment of 3,099 were damaged by bending, with a resulting loss of $257.08. However, the Court finds from the evidence that plaintiff has wholly failed to sustain its burden of proof to show that this bending damage occurred while in the custody of the defendants and not during carriage by inland conveyance. There was, in fact, no evidence of where the bending occurred, and the Court cannot infer that it occurred during ocean carriage where subsequent inland carriage is also involved. On the contrary, the delivery receipts signed in many instances by an employee of plaintiff, who testified that he was present while this cargo was discharged, contain no exceptions for bent plates. This bending claim is therefore disallowed.

■ Plaintiff also claims that it sustained a loss from shortage of eight pieces of plate under bill of lading No.

6, having value of $533.66. However, again the records prepared at shipside by the cargo tally clerks, apparently with the knowledge and under the supervision of the plaintiff's own employee, who noted no exceptions for shortages, show delivery of the full bill of lading quantity. Accordingly, the Court finds that the evidence fails to show that the alleged shortage was in existence at the time the cargo was delivered from the defendants' custody, and therefore the shortage claim is disallowed.

Plaintiff also contends that it sustained damages of $1,155.46 because twenty-three pieces of plate were discharged to the dock and were not delivered to plaintiff until September 24, 1968, some two and one-half months later. Plaintiff claims that these twenty-three pieces were received in a heavily rusted condition, which depreciated their value by fifty percent. Also included in this portion of the claim were miscellaneous expenses arising from the fact that the twenty-three pieces remained on the dock for two and one-half months.

Sufficient delivery, with notice, was accomplished at the time of discharge, thus terminating the carrier's responsibility, W. Poor, Charter Parties and Ocean Bills of Lading § 61 at 142 (5th ed. 1968); 48 Am.Jur. Shipping §§ 410–11, 413 (1943); *see* Calcot, Ltd. v. Isbrandtsen Co., 318 F.2d 669, 673 (1st Cir. 1963) and cases cited therein. The Court finds that the rusted condition of the twenty-three plates occurred from exposure to the weather and elements while on the dock for two and one-half months following delivery from the defendants' custody.

■ The evidence shows and the Court further finds that the plaintiff knew the plates were on the dock and failed to have them picked up until two and one-half months after discharge from the SS ROSE. Thus, the damage to the twenty-three plates and the related expenses did not result from any failure of the defendants properly to deliver or care for such cargo. This portion of the claim is therefore denied.

The Court finds that the defendants Maru Shipping Co., Ltd. and Retla Steamship Company and the SS ROSE in all respects fully discharged their obligations under the covering bills of lading, the United States Carriage of Goods by Sea Act and the general maritime law, and that the plaintiff shall take nothing of and from the said defendants. Accordingly, defendants shall recover their costs herein expended.