**GREAT AMERICAN TRADING CO., Plaintiff,**

v.

**AMERICAN PRESIDENT LINES, LTD., Defendant.**

No. C–85–3998 SAW.

United States District Court, N.D. California.

July 30, 1986.

David M. Salentine, San Francisco, Cal., for plaintiff.

McCutchen, Doyle, Brown & Enersen, Jack G. Knebel and Richard Maggio, San Francisco, Cal., for defendant.

## OPINION

WEIGEL, District Judge.

This case concerns liability for cargo damage as well as the proper measure of damage. Most of the facts are straightforward and have been agreed upon by the parties.

Great American Trading Company (Gatco), sues American President Lines, Ltd. (APL) for damage to four shipments of brassware shipped from Bombay to San Francisco. The shipments arrived in Oakland between September 26, 1984 and October 31, 1984. Gatco claims damage in the amount of approximately $133,000 plus interest. Jurisdiction in this Court is proper under 28 U.S.C. §§ 1331 and 1333. Throughout this opinion and in Appendix A the Court uses the term "Voyage One" to refer to the voyage comprising Gatco's first cause of action. "Voyage Two" refers to Gatco's second claim, and so on.

Gatco, the consignee, ordered a number of brassware items from P & S Export Corp. (P & S), the shipper. Gatco is a wholesaler, and planned to resell the brass-

ware to various other parties. P & S manufactured the brassware outside New Delhi and delivered it to R. Sharp & Son, Private Ltd. (Sharp), at Sharp's Container Freight Station (CFS) in Bombay. Sharp was APL's agent. APL was to transport the goods from Bombay to San Francisco.

P & S wrapped and packaged each individual piece of brassware in a cardboard box. A quantity of these boxes were then packed together by P & S in larger wax lined cardboard containers, referred to as "master containers." The master containers were bound, i.e. securely closed and wrapped.

P & S delivered the master containers to Sharp's CFS in Bombay. The CFS was under Sharp's control, and APL, as Sharp's principal, was responsible for the goods once they arrived there. Upon arrival they were loaded into a large storage shed. The shed was a metal structure, 700 feet long, 70 feet wide and seven feet tall. Its floor was six inches off the ground. The shed had 12 entrances, each with an overhang extending four feet outside beyond the doorway. There were no windows. Trucks loading master containers to the shed would back up flush against one of the doorways to offload cargo.

After being placed in the shed, the master containers were inspected by three surveyors; one from J.B. Boda Co. (Boda), hired by APL, one from the stevedoring company, and one from the Bombay Port Trust. Captain Bhangara was in charge of the team of Boda surveyors. He testified that it was his policy and his understanding of Indian law that if the exterior of a master container was in good condition, the container was not to be opened. If it showed evidence of water damage it would be opened and its contents inspected. If the goods were sound, they would be repacked in sound master containers. The exteriors of all master containers at issue in this suit were found to be in good condition and none of them were opened by the surveyors in Bombay.

The master containers were later "stuffed" into supposedly watertight metal shipping containers. The shipping containers, provided by APL, were 20 or 40 feet long, eight feet wide and eight feet tall. They were brought to the shed, where they were placed flush against one of the doors. The master containers were moved to the door and inspected by the same three parties that inspected them when they arrived at the CFS. Again, no damage was noted. Captain Bhangara testified that once the master containers were in the shed, there was no way for them to get wet, short of an extraordinary occurrence such as being doused by water during a fire. There was no evidence of any such occurrence. After inspection, the master containers were stuffed inside the shipping containers. Other, unrelated cargo was also stuffed inside the shipping containers in Voyages One, Three and Four.

For each of the four shipments, a "clean bill of lading" was issued, stating that the goods were in "apparent good order and condition" upon being tendered by the shipper, P & S, to APL.

All of the events described above occurring in India took place during monsoon season.

The cargo in Voyages Three and Four was loaded onto vessels bound for Singapore, where it was transferred onto other vessels bound for Kaohsiung, Taiwan, and from there, to still other vessels destined for Oakland. In Voyage One, the goods were loaded onto a vessel bound for Singapore, where the cargo was transferred onto a ship sailing to Hong Kong. From Hong Kong, the goods were placed on a vessel bound for Oakland. The shipping container in Voyage Two was loaded aboard the M/V TACKLER ARABIA, which headed west to the port of Fujairah in the United Arab Emerites. From there, the cargo was loaded aboard the M/V PRESIDENT McKINLEY, which made for Hong Kong. It was then loaded aboard the M/ PRESIDENT GRANT, which sailed to Oakland.

When the ships arrived in Oakland, the cargo was outturned and inspected by the consignee, Gatco, and APL. In each case,

many or all of the master containers were wet to the touch or water stained. In each shipment, some or all of the brassware sustained water damage and was sold as salvage. No one disputes the reasonableness of the salvage price.

It is agreed by the parties that the water damage was caused by freshwater, not saltwater, thus eliminating the possibility that there was any damage from the sea. Other cargo outturned at Oakland that was stuffed in the same shipping containers as the brassware was apparently undamaged in that there have been no complaints from other shippers or consignees.

There was also a shortage of three master containers in Voyage Four. The uncontroverted evidence establishes APL's liability for that loss.

### DISCUSSION

■ Both parties agree that liability in this action must be determined under the Carriage of Goods by Sea Act (Cogsa), 46 U.S.C. § 1300 *et seq.* Cogsa initially places the burden of proof on the consignee to prove that the goods were delivered to the carrier in good condition, but that they arrived after the voyage in damaged condition. Once this *prima facie* case is made, the burden shifts to the carrier to show that the damage was caused by one of the exceptions to liability listed in § 1304(2). *Daido Lines v. Thomas P. Gonzalez Corp.,* 299 F.2d 669, 671 (9th Cir.1962). The parties also agree that where a master container is bound and its contents are not inspected by the carrier, a clean bill of lading does not, of itself, establish the consignee's *prima facie* case. This is consistent with the case law on point. *Caemint Food, Inc. v. Brasileiro,* 647 F.2d 347, 352 (2d Cir.1981) (Friendly, J.); *Ed Miniat, Inc. v. Baltimore & Ohio Ry. Co.,* 587 F.2d 1277, 1280 (D.C.Cir.1978); *Daido, supra,* at 671–72. Railroad shipping cases are citable authority for actions under Cogsa. *Vana Trading Co., Inc. v. S/S METTE SKOU,* 556 F.2d 100, 104 n. 6 (2d Cir.1977).

■ Where the carrier unreasonably deviates from the contracted voyage, the exceptions listed in § 1304(2) are unavailable, and the carrier is a full liability insurer as to any damage caused by the deviation. *General Electric Co. v. S/S NANCY LYKES,* 706 F.2d 80 (2d Cir.1983); *Nemeth v. General Steamship Co.,* 694 F.2d 609, 612–13 (9th Cir.1982). Gatco claims that the TACKLER ARABIA's journey to Fujairah during Voyage Two is such a deviation. APL contends that this was part of the contracted voyage, and that even if there was a deviation, no damage was caused thereby in that the total length of the voyage from Bombay to Oakland, including the deviation, was shorter than the average length of the other three voyages, where there was no deviation.

Gatco is seeking damages calculated as the price for which it would have sold the brassware had it been undamaged, less salvage, plus any additional costs incurred due to the damage sustained, such as survey fees. APL claims that if Gatco is entitled to recover at all, it should receive only its cost and freight charges (C & F), plus incidental costs, less salvage, except where it has proven that it lost sales, in which case APL concedes, as it must, that Gatco is also entitled to recover its lost profit.

#### 1. *Liability*

■ The major dispute between the parties is whether or not Gatco has established a *prima facie* case. Gatco contends that, although there is no direct evidence as to the condition of the brassware at the time of delivery to APL, the change in the external condition of the master containers from delivery at Bombay to outturn at Oakland, coupled with the fact that the damage to the brassware was caused by exposure to freshwater, is showing enough that the damage occurred while the goods were in APL's possession. APL counters that there was evidence that mere exposure to moisture in the air could cause damage to brassware. It also points to evidence that there were damaged goods inside master containers that were externally sound at outturn in Oakland. Finally, APL notes

that the period during which the goods were transported from New Delhi to Bombay by the shipper was monsoon season in India, although the same is true of the period during which the goods were stored and stuffed at the CFS.

To resolve this question, the Court looks to the policy underlying the shifting burden of proof. Prior to the time that the goods are delivered to the carrier, the shipper has exclusive knowledge as to the condition of the goods and the manner in which they are transported to the carrier. Once the goods are in the carrier's possession, though, the carrier has exclusive knowledge as to what happens to them. Because it is reasonable to require the party with exclusive knowledge and control over the goods to explain what happens to them, the burden of proof is upon that party. *See Schnell v. The VALLESCURA*, 293 U.S. 296, 304, 55 S.Ct. 194, 196, 79 L.Ed. 373 (1934); *Pan-American Hide Co. v. Nippon Yusen (Kabushiki), Kaisha*, 13 F.2d 871 (S.D.N.Y.1921) (L. Hand, J.). Although these cases were decided prior to Cogsa's enactment, Cogsa is a codification of international law, reflected in these decisions.

The policy governing burden of proof cuts against both parties. Gatco has not undertaken to show how the goods were transported from New Delhi to Bombay, or what precautions were taken during the packing process to insure that the brassware was not exposed to moisture. Similarly, although APL has described the procedures used to safeguard the cargo from the time the goods were delivered until the time the goods were loaded aboard their respective vessels, it has not explained how the master containers became wet or waterstained at their outturn in Oakland, despite their good condition upon delivery at the CFS.

The Court finds that plaintiff has met its *prima facie* burden. Although a clean bill of lading does not attest to the condition of the goods inside a master container, at the very least it describes the external condition of the master container. *Daido, supra*, at 671–72. The fact that the master

containers were damaged by water, and that their contents were also damaged by water sustains a reasonable inference that whatever caused the damage to the containers also caused the damage to the brassware. Further, because the condition of the master containers changed from the time they were delivered to the CFS to the time they arrived at Oakland, it is clear that the damage to the master containers occurred while the cargo was in the possession of the carrier. *See Caemint Food, supra*, at 355.

The Court has taken into account the testimony of Keith Adams to the effect that some externally sound master containers contained damaged brassware, although the damage was of a lesser degree. Mr. Adams was the surveyor for John Bonner & Associates (Bonner), the survey firm retained by APL, who surveyed three of the four shipments at issue in this case. His testimony is not dispositive. The Lloyd's survey reports state that in Voyages One and Two all of the master containers were damaged. In Voyage Four, Gatco refused delivery of 56 out of 152 master containers. All of the refused containers were damaged. Only in Voyage Three could there have been damaged goods in sound containers. The Lloyds survey report described the number of damaged containers in this shipment as "practically all." The Bonner report set the figure at 60%. The Lloyds surveyor made no mention of any damaged goods in undamaged containers either in his report or while testifying. Nor does the Bonner report.

Given the small number of goods potentially in this category and the paucity of evidence in this regard, the Court does not find Mr. Adams's testimony sufficient to rebut the inference that whatever damaged the containers also caused the damage to the cargo. APL bears a heavy burden of proving, with exactitude, any differentiation in damage sufficient to reduce their liability. *Schnell v. The VALLESCURA*, 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373 (1934); *Vana Trading Co. v. S/S METTE SKOU*, 556 F.2d 100, 105 (2d Cir.1977).

APL contends that even if Gatco makes out a *prima facie* case, defendant has met its burden of showing that it was not at fault for any damage to the cargo and thus it should not be held liable under § 1304(2)(q). This is not correct. Although the testimony of Captain Bhangara, APL's agent's surveyor in Bombay, set forth good and careful procedures for insuring the care of the master containers, APL has not provided the Court with any explanation for the cause of damage.

If APL's evidence as to its procedures in Bombay, and the soundness of the shipping containers, were to be accepted, it would necessarily follow that there could not have been any damage to the master containers. Yet irrefutably there was severe damage to these containers while they were in APL's possession. The cause of the damage has not been disclosed by the evidence, but, as the party with the exclusive knowledge as to the care of the cargo from the time it arrived at the CFS until outturn at Oakland, APL cannot meet its burden under § 1304(2)(q) without advancing some explanation for the changed condition of the master containers.

Further, the only direct testimony introduced as to the handling of the cargo in Bombay was from Captain Bhangara. However, he did not personally see the condition of the cargo when it was stuffed into the shipping containers. Rather, he relied on the reports of his subordinates. The Court does not find this evidence sufficiently probative to meet the burden placed on a carrier to escape liability under § 1304(2)(q).

This finding makes it unnecessary to consider plaintiff's claim of deviation. The Court notes, though, that plaintiff was unable to demonstrate any causal connection between the geographic deviation and any damage to the goods. First, the voyage at issue took 40 days. However, two voyages in which there was no deviation took considerably longer. One took 46 days, and another 48. Second, there is evidence that due to "bottleneck" conditions in various ports of call, even if the TACKLER ARABIA had gone east, not west, the cargo would have arrived in Oakland no sooner than it did.

### 2. *Damages*

The resolution of the legal issues surrounding the measure of damages concerning the cargo shortage in Voyage Four is identical with that surrounding the damaged cargo. Therefore, these losses will be dealt with together.

Cogsa limits the carrier's liability to the shipper's "actual loss." 46 U.S.C. § 1304(5). This is usually reflected by the difference between the "market price" of undamaged goods and the market price of the goods as delivered, plus any incidental costs. However, this general measure of damages is discarded where a better method of quantifying "actual loss" exists. *Illinois Central Ry. Co. v. Crail*, 281 U.S. 57, 63–64, 50 S.Ct. 180, 181, 74 L.Ed. 699 (1930); *Columbia Brick Works, Inc. v. Royal Insur. Co.*, 768 F.2d 1066, 1068–69 (9th Cir.1985); *Brockway-Smith Co. v. Boston & Maine Corp.*, 497 F.Supp. 814, 820 (D.Mass.1980). Where the plaintiff establishes lost profits, the general measure of damages is appropriate. If the plaintiff did not suffer a loss of profits—as, for example, where the goods were merely to be added to inventory—only actual costs, less salvage, are recoverable. *Id.* See also *Dixie Plywood Co. v. S/S FEDERAL LAKES*, 404 F.Supp. 461, 465–66 (S.D.Ga. 1975); Wood, *Damages In Cargo Cases*, 45 Tulane L.Rev. 932, 938 (1971).

In support of its contention that the damaged goods led to lost sales, Gatco offered the testimony of its Vice-President and General Manager Steve Carlson. Mr. Carlson stated that there was a market for the brassware, and that a number of orders for the goods already had been placed and other orders were placed soon after the damaged goods arrived. Most of the orders, he testified, had to remain unfilled. Finally, Mr. Carlson noted that the loss occurred during the time when holiday sea-

son orders were coming in, leading to additional lost sales.

These assertions are not supported by the exhibits in the case. There were a number of items for which Gatco had a substantial inventory prior to the expected arrival of the four shipments at issue in this case. Although Mr. Carlson stated that there were unfilled orders on file with Gatco, these orders were not offered into evidence. Gatco has produced no records establishing what orders were lost due to the damaged cargo. The Court realizes that Gatco cannot produce records establishing this amount with exactitude. Even so, the lack of *any* such evidence in light of the large inventories extant at the time the damaged goods arrived negates Mr. Carlson's conclusory testimony.

In determining damages, the burden of proof never leaves the plaintiff. *Brockway-Smith, supra,* at 821; *Santiago v. Sea-Land Services, Inc.,* 366 F.Supp. 1309, 1315 (D.P.R.1973). Mr. Carlson's testimony is not sufficient to meet this burden. Therefore, the Court finds that plaintiff's "actual loss" should be limited primarily to its actual costs, less salvage. The gross loss is measured by the C & F for the goods plus other fees associated with the salvage and surveys taking place at Oakland.

■ APL, in its trial brief, concedes that "to the extent that plaintiff's inventory stock was *insufficient* to meet its outstanding sales commitments [ ] plaintiff [lost] profits because of this cargo loss. And only to that extent is plaintiff entitled to its lost profit." (emphasis in original). It is reasonable to assume that those who had outstanding orders with Gatco would not wait the additional six months necessary for plaintiff to arrange for another shipment of goods. Therefore, to the extent that plaintiff had outstanding orders for the brassware prior to its arrival in damaged condition, Gatco may recover its lost profits. Those orders are listed in Gatco's August 1984 Inventory Report.

■ The specific breakdown of damages for each voyage are set forth in the tables comprising Appendix A. These tables establish the gross loss for each voyage, blending the C & F measure and the lost profits measure where appropriate. Survey and segregation fees are added to this gross figure to arrive at a total gross loss. Salvage is deducted from the total gross loss to determine the net recovery for each voyage. Using these figures, the Court finds that Gatco is entitled to recover a total of $52,494.33, representing the losses from all four voyages.

■ Prejudgment interest may be awarded in the discretion of the Court in admiralty cases. *Columbia Brick Works, supra,* at 1068; *Alkmeon Naviera, S.A. v. M/V MARINA L.,* 633 F.2d 789, 797 (9th Cir.1980). Interest is proper in this case to compensate Gatco. Prejudgment interest shall be calculated from the date each shipment arrived for outturn at Oakland.

Interest shall be computed at the rates set forth in Appendix B. These rates were calculated in the manner described in 28 U.S.C. § 1961(a). Such a measure is appropriate in admiralty cases. *See Western Pacific Fisheries, Inc. v. S/S PRESIDENT GRANT,* 730 F.2d 1280, 1289 (9th Cir.1984).

Judgment shall be entered in favor of Gatco in accordance with the foregoing, which constitutes the Findings of Fact and Conclusions of Law in this case.

APPENDIX A

Notes to Appendix A:

In each table, the first column represents the item number. Since all items begin with the letter "E", the Court has put this in the heading only. The items are listed in the same order as found in Gatco's tables of damages (Plaintiff's exhibits 7, 19, 31 and 43), except that where the same item was in more than one container for the same voyage, it has been cumulated for purposes of this appendix.

Column two provides the number of goods found damaged at outturn for each item. This is the total number of goods,

whether the damage calculation is based on C & F or on resale price.

Column three sets forth the number of outstanding orders according to Gatco's August 1984 inventory (Plaintiff's exhibit 54) for each item. Where goods with outstanding orders were involved in more than one shipment, the Court applied the outstanding orders first to the first shipment, and any remaining outstanding orders to the next shipment until such orders were exhausted. Where the number of outstanding orders exceeded the total number of goods shipped in all shipments, the number in this column will be the same as the number in column two.

The fourth column is the C & F cost for each item as set forth in the P & S invoice (Plaintiff's exhibits 2, 14, 26 and 35).

The fifth column contains the resale price taken from Gatco's 1984 price list (Plaintiff's exhibit 51), except where otherwise indicated. Where there were no outstanding orders for an item, the notation "N/A" appears instead of a price.

Column six states the total loss for each item on each voyage. This amount is calculated by multiplying the number of outstanding orders for an item by the resale price. The Court added to that sum the number of damaged goods, less the number of outstanding orders, multiplied by the C & F cost. In mathematical terms, the formula is as follows: (# 3 $\times$ # 5) + ((# 2 - # 3) $\times$ # 4) = # 6.

At the end of each table, column six is tallied. The Court added the survey and/or segregation fees where appropriate and subtracted the salvage value. The net figure is the total recoverable amount for each voyage.

A single asterisk (" *") means that Gatco did not include inventory data for this item in its August 1984 inventory list. The Court presumes that there were no outstanding orders for such products.

A double asterisk (" **") means that the resale price did not appear in the 1984 price list. The Court used the 1985 list for these items (Plaintiff's exhibit 52).

A triple asterisk (" ***") means that the inventory description of the item did not describe the actual piece of brassware. Instead, the notation "N A NOW" appeared. Although the Court assumes that this means "not available now," clearly the item was on order. Therefore, the Court simply disregarded that description.

## VOYAGE ONE

| Item # (E) | Qnty dmgd | Qnty on ordr | C & F cost | Resale price | Total loss |
|---|---|---|---|---|---|
| 1200 | 250 | * | 7.00 | N/A | 1750.00 |
| 1205 | 500 | * | 2.90 | N/A | 1450.00 |
| 1206 | 500 | * | 1.25 | N/A | 625.00 |
| 904 | 300 | 0 | 4.25 | N/A | 1275.00 |
| 1431 | 30 | * | 2.80 | N/A | 84.00 |
| 721 | 10 | 0 | 7.25 | N/A | 72.50 |
| 722 | 8 | 0 | 6.75 | N/A | 54.00 |
| 725 | 12 | 0 | 4.15 | N/A | 49.80 |
| 736 | 185 | 0 | 1.25 | N/A | 231.25 |
| 737 | 40 | 0 | 2.25 | N/A | 90.00 |
| 738 | 40 | 0 | 2.95 | N/A | 118.00 |
| 909 | 500 | 0 | 1.75 | N/A | 875.00 |
| 558 | 12 | 0 | 6.75 | N/A | 81.00 |
| 565 | 4 | 0 | 11.45 | N/A | 45.80 |
| 370 | 48 | 0 | 4.90 | N/A | 235.20 |
| 805 | 72 | 5 | 4.25 | 9.50** | 332.25 |

## VOYAGE ONE

| Item # (E) | Qnty dmgd | Qnty on ordr | C & F cost | Resale price | Total loss |
|---|---|---|---|---|---|
| 369 | 50 | 1 | 2.95 | 6.50** | 151.05 |
| 744 | 75 | 0 | 2.85 | N/A | 213.75 |
| 152 | 60 | 0 | 27.50 | N/A | 1650.00 |
| 276 | 250 | 0 | 2.33 | N/A | 582.50 |
| 301 | 50 | 0 | 2.85 | N/A | 142.50 |
| 302 | 220 | 15 | 3.35 | 9.50 | 829.25 |
| 406 | 180 | 0 | 2.08 | N/A | 374.40 |
| 410 | 149 | 29 | 10.00 | 25.00 | 1925.00 |
| 440 | 140 | 0 | 4.00 | N/A | 560.00 |
| 228 | 170 | 0 | 5.00 | N/A | 850.00 |
| 403 | 20 | 0 | 5.50 | N/A | 110.00 |
| 402 | 15 | 0 | 3.30 | N/A | 49.50 |
| 430 | 9 | 0 | 10.50 | N/A | 94.50 |
| 272 | 60 | 4 | 2.55 | 6.00 | 166.80 |
| 463 | 504 | 292 | 1.10 | 2.50 | 963.20 |
| 501 | 20 | 0 | 3.50 | N/A | 70.00 |
| 865 | 4 | 0 | 16.50 | N/A | 66.00 |
| 831 | 38 | 16 | 45.50 | 100.00 | 2601.00 |
| 820 | 88 | 0 | 29.50 | N/A | 2596.00 |
| 841 | 90 | 16 | 8.00 | 20.00 | 912.00 |
| 798 | 48 | 9 | 16.50 | 35.00 | 958.50 |

TOTAL LOSS FROM DAMAGED GOODS ......................... $23,234.75
SURVEY FEE ............................................... 1,224.00
 24,458.75
(SALVAGE) ................................................ (11,121.13)
NET RECOVERABLE LOSS, VOYAGE ONE ...................... 13,337.62

## VOYAGE TWO

| Item # (E) | Qnty dmgd | Qnty on ordr | C & F cost | Resale price | Total loss |
|---|---|---|---|---|---|
| 1465 | 50 | 0 | 10.00 | N/A | 500.00 |
| 795 | 147 | 102 | 3.75 | 8.50 | 1035.75 |
| 792 | 90 | 0 | 3.75 | N/A | 337.50 |
| 791 | 90 | 21 | 3.75 | 8.50 | 437.25 |
| 806 | 48 | 0 | 7.45 | N/A | 357.60 |
| 821 | 12 | 0 | 27.50 | N/A | 330.00 |
| 1217 | 100 | * | 15.00 | N/A | 1500.00 |
| 740 | 175 | 34 | 3.10 | 7.00 | 675.10 |
| 204 | 500 | 188 | 4.50 | 10.00 | 3284.00 |
| 1007 | 100 | * | 4.40 | N/A | 440.00 |
| 788 | 192 | 0 | 4.00 | N/A | 768.00 |
| 802 | 180 | 0 | 4.00 | N/A | 720.00 |
| 1400 | 40 | * | 18.00 | N/A | 720.00 |
| 615B | 100 | 0 | 3.00 | N/A | 300.00 |
| 615C | 100 | 0 | 4.40 | N/A | 440.00 |

### VOYAGE TWO

| Item # (E) | Qnty dmgd | Qnty on ordr | C & F cost | Resale price | Total loss |
|---|---|---|---|---|---|
| 615A | 67 | 7 | 2.10 | 5.00 | 161.00 |
| 760 | 500 | 7 | 1.75 | 8.00 | 918.75 |
| 840 | 10 | 10 | 8.00 | 20.00 | 200.00 |
| 770 | 294 | 0 | 1.85 | N/A | 543.90 |
| 832 | 12 | 7 | 45.50 | 100.00 | 927.50 |
| 908 | 488 | 199 | 1.60 | 3.50 | 1158.90 |
| 800 | 198 | 0 | 10.95 | N/A | 2168.10 |
| 771 | 92. | 0 | 1.125 | N/A | 103.50 |
| 440 | 140 | 0 | 4.00 | N/A | 560.00 |
| 210 | 484 | 0 | 1.87 | N/A | 905.08 |
| 779 | 280 | 0 | 3.25 | N/A | 910.00 |
| 1404 | 80 | * | 10.80 | N/A | 864.00 |
| 1204 | 250 | * | 2.90 | N/A | 725.00 |
| 1205 | 250 | * | 2.90 | N/A | 725.00 |
| 1206 | 250 | * | 1.25 | N/A | 312.50 |
| 1415 | 14 | * | 16.50 | N/A | 231.00 |
| 528 | 36 | 2 | 9.50 | 21.00** | 365.00 |
| 370 | 72 | 0 | 4.90 | N/A | 352.80 |
| 369 | 25 | 0 | 2.95 | N/A | 73.75 |
| 220 | 18 | 18 | 2.10 | 4.50 | 81.00 |
| 235 | 189 | 0 | 2.00 | N/A | 378.00 |
| 238 | 56 | 0 | 1.85 | N/A | 103.60 |
| 463 | 576 | 0 | 1.10 | N/A | 633.60 |
| 228 | 10 | 0 | 5.00 | N/A | 50.00 |
| 229 | 10 | 9 | 8.38 | 18.50 | 174.88 |
| 232 | 15 | 0 | 4.05 | N/A | 60.75 |
| 230 | 60 | 0 | 4.15 | N/A | 249.00 |
| 303 | 50 | 0 | 6.90 | N/A | 345.00 |
| 418 | 8 | 0 | 44.00 | N/A | 352.00 |
| 439 | 150 | 0 | 9.60 | N/A | 1440.00 |
| 301 | 25 | 0 | 2.85 | N/A | 71.25 |

TOTAL LOSS FROM DAMAGED GOODS ........................... $27,990.06
SURVEY FEES................................................ 1,240.00

29,230.06
(SALVAGE) .................................................... (9,000.00)
TOTAL RECOVERABLE LOSS, VOYAGE TWO..................... 20,230.06

### VOYAGE THREE

| Item # (E) | Qnty dmgd | Qnty on ordr | C & F cost | Resale price | Total loss |
|---|---|---|---|---|---|
| 1470 | 52 | 0 | 7.15 | N/A | 371.80 |
| 1500 | 50 | 0 | 62.50 | N/A | 3125.00 |
| 220 | 336 | 0 | 2.10 | N/A | 705.60 |
| 238 | 384 | 0 | 1.85 | N/A | 710.40 |
| 274 | 56 | 0 | 3.25 | N/A | 182.00 |

## VOYAGE THREE

| Item #<br>(E) | Qnty<br>dmgd | Qnty<br>on ordr | C & F<br>cost | Resale<br>price | Total<br>loss |
|---|---|---|---|---|---|
| 304 | 10 | 0 | 10.52 | N/A | 105.20 |
| 350 | 44 | 0 | 2.70 | N/A | 118.80 |
| 369 | 200 | 0 | 2.95 | N/A | 590.00 |
| 370 | 84 | 0 | 4.90 | N/A | 411.60 |
| 400 | 24 | 0 | 5.50 | N/A | 132.00 |
| 402 | 100 | 0 | 3.30 | N/A | 330.00 |
| 403 | 60 | 0 | 5.50 | N/A | 330.00 |
| 463 | 1008 | 0 | 1.10 | N/A | 1108.80 |
| 411 | 28 | 0 | 45.00 | N/A | 1260.00 |
| 429 | 140 | 4 | 8.80 | 20.00 | 1276.80 |
| 463 | 1008 | 0 | 1.10 | N/A | 1108.80 |
| 528 | 36 | 0 | 9.50 | N/A | 342.00 |
| 557 | 39 | 25 | 4.10 | 9.00 | 282.40 |
| 558 | 142 | 0 | 6.75 | N/A | 958.50 |
| 721 | 20 | 0 | 7.25 | N/A | 145.00 |
| 730 | 36 | 0 | 9.50 | N/A | 342.00 |
| 735 | 20 | 0 | 4.25 | N/A | 850.00 |
| 781 | 61 | 0 | 4.95 | N/A | 301.95 |
| 793 | 210 | 210 | 3.75 | 8.50 | 1785.00 |
| 805 | 408 | 0 | 4.25 | N/A | 1734.00 |
| 830 | 2 | 2*** | 58.30 | 120.00 | 240.00 |
| 998 | 17 | 0 | 11.00 | N/A | 187.00 |
| 430 | 108 | 0 | 10.50 | N/A | 1134.00 |

TOTAL LOSS FROM DAMAGED GOODS ......................... $19,059.85
SURVEY & SEGREGATION ...................................... 2,447.50
 21,507.35
(SALVAGE) ..................................................... (5,250.00)
TOTAL RECOVERABLE LOSS, VOYAGE THREE ................... 16,257.35

## VOYAGE FOUR

| Item #<br>(E) | Qnty<br>dmgd | Qnty<br>on ordr | C & F<br>cost | Resale<br>price | Total<br>loss |
|---|---|---|---|---|---|
| 1210 | 24 | * | 24.00 | N/A | 576.00 |
| 1415 | 20 | * | 16.50 | N/A | 330.00 |
| 152 | 4 | 0 | 27.50 | N/A | 110.00 |
| 370 | 12 | 0 | 4.90 | N/A | 58.80 |
| 528 | 12 | 0 | 9.50 | N/A | 114.00 |
| 780 | 40 | 17 | 2.50 | 5.50 | 151.00 |
| 798 | 18 | 0 | 16.50 | N/A | 297.00 |
| 810C | 6 | 0 | 9.75 | N/A | 58.50 |
| 821 | 4 | 0 | 27.50 | N/A | 110.00 |
| 832 | 2 | 0 | 45.50 | N/A | 91.00 |
| 840 | 30 | 30 | 8.00 | 20.00 | 600.00 |
| 900 | 24 | 0 | 23.50 | N/A | 564.00 |

### VOYAGE FOUR

| Item #<br>(E) | Qnty<br>dmgd | Qnty<br>on ordr | C & F<br>cost | Resale<br>price | Total<br>loss |
|---|---|---|---|---|---|
| 935 | 156 | 1 | 7.50 | 17.00 | 1179.50 |
| 936 | 156 | 1 | 7.50 | 17.00** | 1179.50 |

TOTAL LOSS FROM DAMAGED GOODS .......................... $5,419.30
SURVEY ...................................................... 0.00

5,419.30
(SALVAGE) ................................................... (1,750.00)
TOTAL RECOVERABLE LOSS, VOYAGE FOUR ................... 3,669.30

### APPENDIX B

| FROM | TO | RATE |
|---|---|---|
| 9/26/84 | 9/27/84 | 11.98% |
| 9/28 | 10/25 | 11.36 |
| 10/26 | 11/27 | 10.33 |
| 11/28 | 12/20 | 9.50 |
| 12/21 | 1/17/85 | 9.08 |
| 1/18/85 | 2/14 | 9.09 |
| 2/15 | 3/14 | 9.17 |
| 3/15 | 4/14 | 10.08 |
| 4/15 | 5/15 | 9.15 |
| 5/16 | 6/6 | 8.57 |
| 6/7 | 7/9 | 7.70 |
| 7/10 | 8/1 | 7.60 |
| 8/2 | 8/29 | 8.18 |
| 8/30 | 9/26 | 7.91 |
| 9/27 | 10/24 | 7.87 |
| 10/25 | 11/26 | 8.08 |
| 11/27 | 12/19 | 7.87 |
| 12/20 | 1/16/86 | 7.57 |
| 1/17/86 | 2/13 | 7.85 |
| 2/14 | 3/13 | 7.71 |
| 3/14 | 4/10 | 7.06 |
| 4/11 | 5/13 | 6.31 |
| 5/14 | 6/5 | 6.56 |
| 6/6 | 7/8 | 7.03 |
| 7/9 | present | 6.35 |