The GF COMPANY, Plaintiff,

v.

PAN OCEAN SHIPPING COMPANY, LTD., Defendant.

No. CV 90–6952 RG(JRx).

United States District Court,
C.D. California.

June 4, 1992.

Reconsideration Denied Sept. 17, 1992.

Dennis J. Seider, Seider & Cohan, Los Angeles, Cal., for plaintiff.

David E.R. Woolley of William, Woolley, Cogswell, Nakazawa & Russell, Los Angeles, Cal., for defendant.

## ORDER

GADBOIS, District Judge.

On February 10, 1992, this Court heard plaintiff's motion for summary judgment or in the alternative for summary adjudication of issues. Dennis Seider of Seider & Cohan appeared for plaintiff The GF Company. David E.R. Woolley of William, Woolley, Cogswell, Nakazawa & Russell appeared for defendant Pan Ocean Shipping Company, Ltd. Having considered

the papers submitted in support of and in opposition to this motion, the arguments of counsel, and the entire record herein, the Court GRANTS plaintiff's motion for summary judgment for the reasons expressed below.

## I. BACKGROUND

This is a case about wood. Plaintiff GF Company ("GF") purchased wooden doorskins from Pyramid Trading Company ("Pyramid"), a supplier in Taiwan. The Cargo, packed into 406 cartons, was shipped aboard the "Pan Queen," a vessel owned and operated by defendant Pan Ocean Shipping Co., Ltd. ("Pan Ocean"). The cargo was purchased pursuant to a letter of credit issued by the Banque Indosuez. This letter of credit required Pyramid to present "clean on-board ocean bills of lading" before Banque Indosuez would render payment.

The Pan Queen set sail on October 18, 1988 and discharged its cargo in Charleston, South Carolina and New Orleans, Louisiana in early December, 1988. Upon inspection, it was discovered that the cargo had sustained substantial physical damage.

When the cargo was loaded aboard the Pan Queen, Pan Ocean had issued bills of lading. Each bill of lading contained a clause indicating that the cargo was

RECEIVED from the shipper herein named the goods or packages said to contain goods hereinafter mentioned, *in apparent good order and condition* unless otherwise indicated in this bill of lading.

(emphasis added).

An additional clause contained in the bills of lading attempted to qualify the phrase "apparent good order and condition," and read:

THE TERM *APPARENT GOOD ORDER AND CONDITION* WHEN USED IN THIS BILL OF LADING WITH REFERENCE TO IRON, STEEL OR METAL PRODUCTS OR WOOD PRODUCTS DOES NOT MEAN THAT THE GOODS, WHEN RECEIVED, WERE FREE OF VISIBLE RUST OR MOISTURE, STAINING, CHAFING AND/OR BREAKAGE. IF THE SHIPPER SO REQUESTS, A SUBSTITUTE BILL OF LADING WILL BE ISSUED OMITTING THE ABOVE DEFINITION AND SETTING FORTH ANY NOTATIONS AS TO RUST OR MOISTURE STAINING, CHAFING AND/OR BREAKAGE WHICH MAY APPEAR ON THE MATES, OR TALLY CLERKS RECEIPTS.

(emphasis added) [hereinafter referred to as the "Pan Ocean Wood Clause"]. The validity of this clause is the central focus of the present dispute.

On December 27, 1990, GF filed a complaint in admiralty seeking to recover for the damage to its cargo. In count one of its complaint, GF alleges that defendant breached the contract of carriage by failing to describe, discharge and deliver the cargo in good order and condition as represented in the bills of lading. The complaint alleges damage in the amount of $138,287.38.

GF now moves for summary judgment on count one.

## II. SUMMARY JUDGMENT STANDARD

To prevail on a motion for summary judgment, the movant bears the burden of showing that no genuine issue of material fact exists and that the movant is entitled to a judgment as a matter of law. Fed. R.Civ.Proc. 56(c). The movant may discharge this burden by showing that no evidence exists to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). To defeat summary judgment, the nonmoving party must demonstrate that a genuine issue for trial exists. *Id.* at 324, 106 S.Ct. at 2553. The nonmoving party may not rest on the pleadings, but must highlight genuine issues through the use of any of the evidentiary materials listed in Federal Rule of Civil Procedure 56(c). *Id.*

## III. DISCUSSION

### A. The Carriage of Goods By Sea Act

The international transportation of cargo by ocean carrier in the United States is

governed by the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. § 1300–1315 (1975 & Supp.1991).[1] Section 1303(3) of COGSA mandates the following:

> After receiving the goods into his charge, the carrier ... shall, on demand of the shipper, issue to the shipper a bill of lading showing among other things—
>
> (a) The leading marks necessary for identification of the goods....
>
> (b) Either the number of packages or pieces, or the quantity or weight, as the case may be, as furnished in writing by the shipper.
>
> (c) The apparent order and condition of the goods: *Provided,* That no carrier, master, or agent of the carrier, shall be bound to state or show in the bill of lading any marks, number, quantity, or weight which he has reasonable ground for suspecting not accurately to represent the goods · actually received, or which he has had no reasonable means of checking.

(emphasis added). This bill of lading is *prima facie* evidence of the receipt by the carrier of the goods as described in the bill of lading in accordance with § 1303(3). 46 U.S.C. § 1303(4).

GF asserts that the bills of lading issued by Pan Ocean establish a *prima facie* case that Pan Ocean received the goods in apparent good order and condition. GF claims that these "clean" bills of lading estop Pan Ocean from denying that the goods were received in good order from the supplier. GF then points to survey reports that establish the fact and amount of damage to the cargo upon delivery, and requests summary judgment on count one of its complaint.

Pan Ocean responds that the Pan Ocean Wood Clause qualifies the phrase "apparent good order and condition." Pan Ocean asserts that this clause allows Pan Ocean to show that any damage to the cargo occurred prior to its receipt of the goods.

According to GF, the Pan Ocean Wood Clause is null and void. GF first argues that COGSA requires a carrier to detail the actual condition of the cargo upon receipt if the cargo is not in good condition. GF next emphasizes that the international banking community treats a bill of lading that contains a Pan Ocean Wood Clause as "clean".[2] Finally, GF claims that the Pan Ocean Wood Clause violates 46 U.S.C. § 1303(8), which prevents a carrier from disclaiming liability for "loss or damage to ... the goods, arising from negligence, fault, or failure in the duties and obligations provided in [§ 1303]."

### B. Tokio Marine and Portland Fish

1. *Tokio Marine & Fire Insurance Company v. Retla Steamship Company*

The Ninth Circuit considered the validity of a clause similar to the Pan Ocean Wood Clause in *Tokio Marine & Fire Insurance Company v. Retla Steamship Company,* 426· F.2d 1372 (9th Cir.1970). In *Tokio Marine,* the plaintiff purchased steel pipe from a Japanese exporter of steel ("the shipper"). *Id.* at 1373. Plaintiff brought suit against defendant steamship company, who transported the steel from Japan to the United States, to recover damages for rust on the pipe discovered upon delivery. *Id.*

Defendant had issued bills of lading to the shipper, which stated that the goods were received in "apparent good order and condition...." *Id.* at 1374. The bills of lading also contained the following clause:

---

1. COGSA was "'lifted almost bodily from the Hague Rules of 1921, as amended by the Brussels Convention of 1924, 51 Stat. 233.'" *Tokio Marine & Fire Insurance Co. v. Retla Steamship Co.,* 426 F.2d 1372, 1377 (9th Cir.1970) (quoting *Herd & Co. v. Krawill Machinery Corp.,* 359 U.S. 297, 301, 79 S.Ct. 766, 769, 3 L.Ed.2d 820 · (1958)). "'The effort of those Rules was to establish a uniform ocean bills of lading to govern the rights and liabilities of carriers and shippers inter se in international trade.'" *Id.* at

1377 n. 9 (quoting *Herd,* 359 U.S. at 301, 79 S.Ct. at 769).

2. The letter of credit issued by Banque Indosuez required the supplier to present clean bills of lading before funds would be released. When the supplier presented the bills of lading at issue in this case, Banque Indosuez accepted them as clean. *See* Declaration of Tanveer A. Kirmani at 2.

THE TERM 'APPARENT GOOD OR-DER AND CONDITION' WHEN USED IN THIS BILL OF LADING WITH REF-ERENCE TO IRON, STEEL OR METAL PRODUCTS DOES NOT MEAN THAT THE GOODS, WHEN RECEIVED, WERE FREE OF VISIBLE RUST OR MOISTURE. IF THE SHIPPER SO RE-QUESTS, A SUBSTITUTE BILL OF LADING WILL BE ISSUED OMITTING THE ABOVE DEFINITION AND SET-TING FORTH ANY NOTATIONS AS TO RUST OR MOISTURE WHICH MAY APPEAR ON THE MATES' OR TALLY CLERKS' RECEIPTS.

*Id.* [hereinafter the "Retla Rust Clause"].

Plaintiff paid the shipper after receiving these bills of lading. *Id.* Plaintiff relied on the bills of lading without knowledge of the actual condition of the pipe. *Id.* Further, plaintiff did not require the shipper to obtain substitute bills of lading setting forth the actual condition of the pipe upon receipt by the carrier. *Id.*

Based primarily on the presence of the Retla Rust Clause, the district court held that defendant was not estopped from showing the existence of the rust and moisture at the time of the receipt of the steel. *Id.* Arguing on appeal that defendant should be estopped to deny the good order and condition of the goods, plaintiff maintained that the Retla Rust Clause was invalid, that the carrier represented the cargo to be in good order and condition, and that the bill of lading was tantamount to a clean bill. *Id.*

In affirming the district court, the Ninth Circuit first reasoned that the bills of lading, "read fairly as a whole," show that the term "good order and condition" was qualified by the Retla Rust Clause. *Id.* at 1378. Furthermore, the court noted that 46 U.S.C. § 1303(3)(c) provides that the carrier shall *on demand of the shipper* issue a bill of lading showing, among other things, the "apparent order and condition" of the goods. *Id.* The court interpreted this provision as requiring the shipper to demand that the bills of lading detail the actual condition of the goods, which the shipper had failed to do. *Id.* Moreover, the court

held that the Retla Rust Clause was not an attempt to relieve the carrier from liability for loss or damage due to negligence or fault as proscribed by 46 U.S.C. § 1303(8). The court reasoned that § 1303(8) was inapplicable because it applied only to attempts to disclaim liability for damages that developed during carriage, and not to representations about the conditions of the goods upon receipt. *Id.* at 1379.

### 2. *Portland Fish Company v. States Steamship Company*

Four years later, the Ninth Circuit was faced with a similar dispute in the case of *Portland Fish Co. v. States Steamship Co.*, 510 F.2d 628 (9th Cir.1974). There, plaintiff purchased frozen tuna from a seller in the Philippines. *Id.* at 630. Plaintiff deposited a letter of credit with a Philippine bank authorizing payment to the seller upon presentation of a bill of lading. *Id.* The defendant carrier received the tuna and issued a bill of lading to the seller, which stated that the fish were *"SAID TO WEIGH ... 30 SHORT TONS." Id.* Seller presented this bill of lading to the bank who paid the seller pursuant to the letter of credit. *Id.*

When the defendant carrier reached its destination, it was discovered that the fish only weighed 12.825 tons. *Id.* Plaintiff then commenced suit in admiralty to recover from defendant the amount of the difference between the sum paid to the seller against the letter of credit and the actual value of the cargo. *Id.* Plaintiff argued that defendant was estopped from denying the weight stated in the bill of lading. *Id.*

The Ninth Circuit reversed the district court and held for the plaintiff. The court emphasized that one of COGSA's objectives was "to enhance the currency and negotiability of ocean bills of lading." *Id.* at 632. The court then reasoned that plaintiff's reliance on the bill of lading was manifest and fully justified. *Id.* at 633. Significantly, the court opined that "the bill was 'clean'—the qualification 'said to weigh' did not befoul it." *Id.*

*Portland Fish* did not directly confront *Tokio Marine*.[3] Both cases, however, involved bills of lading that contained a general description of the cargo and a clause qualifying that description.[4] In *Tokio Marine*, the Ninth Circuit held that the qualification rendered the bill unclean. In *Portland Fish*, the same court held that the qualification did not befoul the bill. It is argued by plaintiff, therefore, that *Portland Fish* implicitly overruled, or at least severely eroded, the *Tokio Marine* holding. As will be discussed below, however, both decisions are consistent with COGSA's primary objective: to insure the negotiability of the bill of lading. *See Portland Fish*, 510 F.2d at 632 and n. 9.

## C. The Negotiability of the Bill of Lading

The Retla Rust Clause at issue in *Tokio Marine* provided:

THE TERM 'APPARENT GOOD ORDER AND CONDITION' WHEN USED IN THIS BILL OF LADING WITH REFERENCE TO IRON, STEEL OR METAL PRODUCTS DOES NOT MEAN THAT THE GOODS WHEN RECEIVED, WERE FREE OF VISIBLE RUST OR MOISTURE.

Prior to the use of this clause, ocean carriers felt compelled to issue bills of lading identifying the existence of rust or moisture on steel, wherever it was found, and regardless of its extent. *See* Declaration of Robert A. Fletcher ¶ 9 ("Fletcher Declaration").[5] This was due to the progressive nature of the rusting process, which forced the carrier to detail every bit of moisture and rust that it detected at the time of shipment to protect itself against the likely possibility that the rusting process would reach fruition during carriage. *Id.* Many "unclean" bills of lading resulted, leading banks to reject the bills and withhold payment. *Id.* at ¶ 10. "The practical effect was that the sale transaction was interrupted and in innumerable instances: the shipper could not get paid, the receiver could not receive his cargo (because his bank had not accepted the bills of lading), while the banks were themselves perceived as being unreasonably technical." *Id.* at ¶ 11.

The Retla Rust Clause solved many of these practical problems:

In banking terms, it created an acceptable document, since no stamped or written clauses were placed on the bill of lading. The actual condition of the cargo on receipt was recorded on mates' receipts or tally clerks' receipts so that a record was maintained. By virtue of the specific statement in block capital, on the face of the bill of lading, the buyer of the steel pursuant to bill of lading transfer was always aware that no representation of condition was made.

*Id.* at ¶ 14. In sum, the Retla Rust clause restored the negotiability to bills of lading used in connection with the transportation of steel while at the same time protecting ocean carriers from the undeterminable consequences of the rusting process.

The *Portland Fish* court was also acutely concerned that the carrier's use of the phrase "said to weigh" would impair the negotiability of the bill of lading. The court reasoned that the carrier's representation in the bill that the cargo weighed thirty short tons was conclusive as against the carrier and estopped it from attempting to show otherwise. *Portland Fish*, 510 F.2d at 633. Implicit in the court's reasoning was the notion that the purchaser's

---

**3.** Although the court appeared to distinguish *Tokio Marine* on the basis that the plaintiff's reliance in *Tokio Marine* was unreasonable, *see id.* at 633 n. 13, the court offered no explanation for this conclusory determination. Indeed, it is difficult to envision why the plaintiff in *Portland Fish* was justified in relying on the bill of lading while the plaintiff in *Tokio Marine* was not.

**4.** In *Tokio Marine*, the bill proclaimed that the goods were received in apparent good order and

condition, and qualified that statement with the Retla Rust clause. In *Portland Fish*, the bill stated that the cargo weighed 30 tons, but qualified that statement with the phrase "said to weigh".

**5.** Robert Fletcher was the counsel of record in the *Tokio Marine* case and the principal author of Retla Rust Clause used by the *Tokio Marine* defendant. Fletcher Declaration ¶ 9.

inability to rely on the stated weight would severely hamper the bill's negotiability. *See id.* Moreover, the problems associated with the rusting process that led the *Tokio Marine* court to validate the Retla Rust clause were not present in *Portland Fish.* The weight of the cargo was fixed at the time of shipment; the carrier did not need protection against progressive change.[6]

 The Court must analyze the Pan Ocean Wood Clause against this backdrop. This clause provides:

> THE TERM 'APPARENT GOOD ORDER AND CONDITION' WHEN USED IN THIS BILL OF LADING WITH REFERENCE TO IRON, STEEL OR METAL PRODUCTS *OR WOOD PRODUCTS* DOES NOT MEAN THAT THE GOODS, WHEN RECEIVED, WERE FREE OF VISIBLE RUST OR *MOISTURE STAINING, CHAFING AND/OR BREAKAGE.*

(emphasis added to demonstrate difference between Pan Ocean Wood Clause and Retla Rust clause).

Neither the staining, chafing, nor breakage of wood is the result of a progressive process. At the point of origin, the wood is either chafed, stained, or broken, or it is not. Thus, the ocean carriers' concern about the rusting process that justified the decision in *Tokio Marine* is not present in this case. Since the carrier need not anticipate that some progressive process will damage the wood, the carrier must issue a clean bill of lading if the wood is in good order and condition upon receipt.

Since the concerns that were present in *Tokio Marine* are wanting in this case, the Court is guided by the underlying rationale of the *Portland Fish* holding. In the Court's view, the Pan Ocean Wood Clause, if validated, creates a situation that is ripe for abuse. Specifically, the shipper may only receive payment if it obtains a "clean" bill of lading from the carrier. Since the international banking community treats a bill of lading that contains a Pan Ocean Wood Clause as "clean", *see* Kirmani Declaration at ¶ 7, the shipper may deliver damaged wood to the carrier and accept a bill of lading containing such a clause. The shipper receives payment long before the consignee can inspect the wood, while the carrier may deny that the wood was in good order and condition at the point of origin. The burden is thus unfairly shifted to the innocent consignee, who is left attempting to demonstrate the condition of the wood delivered many months prior to a distant port.

As discussed in *Portland Fish,* the consignee's inability to rely on the bill of lading's representation that the goods were in good order and condition upon delivery would hamper the negotiability of the bill of lading. A consignee in such a predicament would be forced to direct its bank to withhold payment until it had inspected the goods. This would render the bill of lading useless, a result contrary to COGSA's objectives.[7] Because the Court must attempt to interpret and further COGSA's directives, the Court holds that the Pan Ocean Wood Clause does not befoul an otherwise clean bill of lading.[8]

---

**6.** Furthermore, as the court noted, COGSA expressly provides the means by which carriers may protect themselves if they are unable to determine the cargo's weight. 46 U.S.C. § 1303(3)(c) provides:

[N]o carrier shall be bound to state or show in the bill of lading any marks, number, quantity, or weight which he has reasonable ground for suspecting not accurately to represent the goods actually received, or which he has had no reasonable means of checking.

Thus, this protection made the carrier's use of the phrase "said to weigh" even less necessary, and more likely to hamper the bill's negotiability.

**7.** It could be argued that the absence of the Pan Ocean Wood Clause will lead carriers to make numerous notations on the bills of lading about the condition of the wood at the point of shipment. In this situation, the shipper may not receive payment for the goods because it will be unable to present a clean bill of lading to the bank as required by the letter of credit. This is a burden fairly born by the shipper, however. Indeed, the shipper may avoid such a consequence by merely delivering undamaged wood at the point of origin—a prerequisite that is hardly unfair.

**8.** As mentioned previously, plaintiff also argues that the Pan Ocean Wood Clause violates 46

## D. Plaintiff Has Established A Prima Facie Case

■ The doorskins purchased by plaintiff in this case

> were paired either face-to-face or back-to-back, underlaid with polyethylene and packed 200 to a crate. Crates were made from waster sheets and banded together by two longitudinal and four transverse steel banks of 3/4″ width with vinyl corner protectors installed under the bands. Waster sheets on ends and sides were reinforced at edges by 3″ x 1/2″ wooden corner battens. Bottom waster sheets were mounted on four, equally spaced, 2″ x 2″ wooden risers which were furrowed to receive steel bands.

Declaration of Gregory Frumkin, Exhibit C, at 2 (Survey Report Conducted On Goods At Point of Delivery).

Since the Court has found that the bills of lading in this case were "clean", plaintiff has stated a *prima facie* case that these crates of plywood were delivered in good condition to defendant. *See* 46 U.S.C. § 1303(4); *Caemint Food, Inc. v. Brasilei-ro,* 647 F.2d 347, 352 (2nd Cir.1981); *Great American Trading Co. v. American President Lines, Ltd.,* 641 F.Supp. 396, 400 (N.D.Cal.1986). The bills of lading are *prima facie* evidence of the good *external* condition of the crates at the time of delivery to defendant. *See Great American Trading Co.,* 641 F.Supp. at 400. Moreover, the Court finds from the description of the cargo upon delivery in the United States [9] that a reasonable inference may be drawn that whatever led to the damage to the external packaging of the doorskins also led to the damage to the doorskins themselves and that this change in condition occurred while the cargo was in the possession of the defendant. *See Great American Trading Co.,* 641 F.Supp. at 400.[10]

## E. Defendant's Burden

■ Once the plaintiff has established its *prima facie* case, the burden shifts to the defendant to show that the damage was caused by one of the exceptions to liability identified in 46 U.S.C. § 1304(2).[11]

---

U.S.C. § 1303(8). The Court holds that, as in *Tokio Marine,* § 1303(8) is not applicable to the type of clause at issue. *See* 426 F.2d at 1379.

**9.** Specifically, upon delivery in the United States,

> several of the crates were noted with their bands broken and/or missing and with waster sheets on ends and sides adrift; some of these crates appeared to have been recouped to varying degrees. In some cases, crates had lost all of the original packing and doorskins were held together merely by two steel bands. Contents of crates, where exposed, were damaged on ends/edges and a number of crates were noted to have doorskins with chipped corners. In addition, few crates bore forklift blade marks where these had punctured waster sheets on the sides and were therefore listed as having concealed damage.

Frumkin Declaration, Exhibit C, at 2 (Survey Report).

**10.** In *Great American Trading Co.,* the plaintiff consignee brought suit against defendant for damage to four shipments of brassware shipped from Bombay to San Francisco. *Id.* at 397. Each individual piece of brassware was packaged in a cardboard box. *Id.* at 398. A quantity of these boxes were then packed together in larger wax lined cardboard containers, referred to as "master containers." *Id.*

Clean bills of lading were issued for the shipment of the brassware. *Id.* When the cargo reached its destination, many of the master containers were wet to the touch or water stained. *Id.* at 399. The brassware also sustained water damage and was sold as salvage. *Id.*

The primary dispute between the parties was whether or not the plaintiff had established a *prima facie* case. *Id.* The plaintiff contended that although no direct evidence existed as to the condition of the brassware at the time of delivery to defendant, the change in the external condition of the master containers from the point of origin to the point of delivery was showing enough that the damage had occurred while in defendant's possession. *Id.*

The court held that the plaintiff had stated a *prima facie* case. The court first reasoned that the clean bill of lading was evidence of the good order and condition of at least the external condition of the master containers. *Id.* at 400. Furthermore, "[t]he fact that the master containers were damaged by water, and that their contents were also damaged by water sustains a reasonable inference that whatever caused the damage to the containers also caused the damage to the brassware." *Id.*

**11.** Section 1304(2) provides:

(2) Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from—

*See Great American Trading Co.,* 641 F.Supp. at 401. Defendant's only defense, however, is that the wood was damaged before it was loaded onto defendant's ship. As discussed thoroughly above, defendant is estopped from denying the good order and condition of the wood upon receipt. Defendant does not offer any other defense or provide the Court with any other explanation for the damage. Moreover, although defendant maintains that genuine issues of fact exist about how the cargo was damaged, defendant does not offer any evidence to support this assertion.[12] Defendant may not rely on mere assertions, however, but must submit affidavits, depositions, or interrogatories as support. *See Celotex,* 477 U.S. at 324. Plaintiff is therefore entitled to summary judgment.

## F. Damages

■ Since plaintiff has established its *prima facie* case for recovery, which defendant cannot overcome, the only remaining issue is plaintiff's damages. In its complaint, plaintiff prays for $138,287.38, which represents "the reasonable cost of determining the nature and extent of market loss and damage, the depreciation and loss in market value of said cargo, and the

> (a) Act, neglect, or default of the master, mariner, pilot, or the servants of the carrier in the navigation or in the management of the ship;
> (b) Fire. . . .
> (c) Perils, dangers, and accidents of the sea or other navigable waters;
> (d) Act of God;
> (e) Act of War;
> (f) Act of public enemies;
> (g) Arrest or restraint of princes, rulers, or people, or seizure under legal process;
> (h) Quarantine restrictions;
> (i) Act of omission of the shipper or owner of the goods, his agent or representative;
> (j) Strikes or lockouts or stoppage or restraint of labor from whatever cause, whether partial or general: *Provided,* That nothing herein contained shall be construed to relieve a carrier from responsibility for the carrier's own acts;
> (k) Riots or civil commotions;
> (*l*) Saving or attempting to save life or property at sea;
> (m) Wastage in bulk or weight or any other loss or damage arising from inherent defect, quality, or vice of the goods;

cost of securing salvage." Plaintiff also asks for prejudgment interest from December 4, 1988—the time that the goods were delivered.

When plaintiff became aware that the cargo was damaged, it appointed surveyors to inspect the cargo. *See* Frumkin Declaration at ¶ 11. The surveyors conducted a thorough analysis of the doorskins, and, after salvage, determined that the final loss to plaintiff amounted to $136,160.07.[13] Frumkin Declaration, Exhibit C at 5 (Surveyor's Report). Although defendant asserts that a genuine dispute exists about the fact and extent of damage, it has again failed to offer any affidavit, deposition testimony, or interrogatory to support this assertion. Judgment is therefore entered in favor of plaintiff in the amount of $136,160.07.

■ In admiralty cases, it is also within the Court's discretion to award prejudgment interest. *See Alkmeon Naviera, S.A. v. M/V Marina L,* 633 F.2d 789, 797 (9th Cir.1980); *Great American Trading,* 641 F.Supp. at 402. The rate for prejudgment interest is calculated pursuant to 28 U.S.C. § 1961(a). *Western Pacific Fisheries, Inc. v. SS President Grant,* 730 F.2d 1280, 1287 (9th Cir.1984). Section 1961(a)

> (n) Insufficiency of packing;
> (*o*) Insufficiency or inadequacy of marks;
> (p) Latent defects not discoverable by due diligence; and
> (q) Any other cause arising without the actual fault and privity of the carrier . . . but the burden of proof shall be on the person claiming the benefit of this exception to show that neither the actual fault or privity of the carrier . . . contributed to the loss or damage.

12. Defendant also argues that plaintiff has failed to allege that it was ever a holder of the bills of lading. Plaintiff's president Gregory Frumkin avers, however, that the bills of lading were provided to the bank and thereafter to him. *See* Frumkin Declaration at ¶ 6. Defendant has not offered evidence to contradict this assertion.

13. The complaint prays for damages in an amount slightly greater than this. Since plaintiff has not explained this discrepancy, the Court will assume that the surveyor's calculation is correct.

provides that such interest shall be calculated at "a rate equal to the coupon issue yield equivalent (as determined by the Secretary of the Treasury) of the average accepted auction price for the last auction of fifty-two week United States Treasury bills...." When awarding pre-judgment interest, the fifty-two week Treasury bill rate on the date of the delivery of the cargo is applicable. *See Columbia Brick Works, Inc. v. Royal Ins. Co.*, 768 F.2d 1066, 1071 (9th Cir.1985).[14] Accordingly, plaintiff is awarded prejudgment interest in the amount of $46,006.38.

## IV. CONCLUSION

For the reasons stated above, GF's Motion for Summary Judgment is GRANTED. GF is awarded damages in the amount of $136,160.07 and prejudgment interest in the amount of $46,006.38.

IT IS SO ORDERED.

---

**14.** The fifty-two week Treasury bill rate on the date of delivery—December 4, 1988—was 8.55%.
