476 F.2d 498
 CUMMINS SALES & SERVICE, INC., Plaintiff-Appellee-Cross Appellant,
v.
LONDON AND OVERSEAS INSURANCE COMPANY and Provincial
Insurance Company Defendants-Appellees-Cross Appellants,
v.
DEUTSCHE DAMPFSCHIFF. GES. "HANSA",
Defendant-Appellant-Cross Appellee.
 No. 28600.
 United States Court of Appeals,
Fifth Circuit.
 March 21, 1973.
Rehearing and Rehearing En Banc Denied May 17, 1973.
 
 Robert M. Julian, Houston, Tex., for defendant-appellant-cross appellee.
 Jon W. Montague, Houston, Tex., for defendants-appellees-cross appellants.
 Philip C. Wrangle, Houston, Tex., for plaintiff-appellee-cross appellant.
 Before GEWIN, THORNBERRY and CLARK, Circuit Judges.
 THORNBERRY, Circuit Judge:
 
 
 1
 Cummins Sales and Service, Inc., brought this suit in admiralty to recover for damage to cargo that was insured by defendants London and Overseas Insurance Company and Provincial Insurance Company ("Underwriters") and that was shipped from Tripoli, Libya, to Houston, Texas, aboard the M/S GOLDENFELS, a vessel owned by defendant Deutsche Dampfschiff. Ges. "Hansa" ("Hansa"). On an earlier appeal from a judgment for Cummins against Underwriters and for Underwriters over against Hansa, this court remanded for entry of findings and conclusions, 5 Cir., 426 F.2d 312. We now affirm the judgment as to liability but remand for a redetermination of damages.
 
 
 2
 The cargo in question was the component parts of a prefabricated metal building. In January 1967, Mid-East Supply Company, a Libyan corporation forty-nine percent of whose stock was controlled by a Cummins affiliate, contracted to purchase the building from a British concern, Taylor Woodrow, Ltd. Terms of the sale were twenty-five percent cash against documentary sight drafts, with the balance to be paid in four equal six-month installments. Taylor Woodrow shipped the building, in the form of 276 packages, to Mid-East in Tripoli aboard the SS WALTER, which arrived in Tripoli on March 3, 1967, and discharged the cargo in good order and condition. Those components which were in boxes and crates were stowed in an uncovered barge in Tripoli harbor, while the structural steel components were stowed on the dock in the open.
 
 
 3
 On March 30, 1967, while the cargo remained at Tripoli harbor, Cummins, for reasons not material to the instant appeal, assumed Mid-East's obligation to purchase the building, in return for Taylor Woodrow's arranging to re-ship the building to Cummins in Houston. Acting on instructions from Taylor Woodrow, T. Gargour & Fils, Ltd., the Tripoli firm which had handled the shipment on the outward voyage from London, made arrangements for re-shipment aboard the GOLDENFELS. After the cargo had been loaded aboard the GOLDENFELS on May 6-7, 1967, T. Gargour & Fils issued a Hansa bill of lading covering the cargo. Although the master of the GOLDENFELS did not sign the bill of lading, it was issued on a Hansa form with the master's knowledge. With two minor exceptions not relevant here ("one drum short shipped"; "one crate broken, contents loose"), the bill of lading was "clean": there was nothing in the bill of lading to suggest that the cargo was not taken aboard the GOLDENFELS in good order and condition.
 
 
 4
 After intermediate stops, the GOLDENFELS reached Houston and discharged her cargo on June 26, 1967, In the meantime, on April 24, 1967, Cummins had paid Taylor Woodrow the twenty-five percent down payment which was then overdue from Mid-East. And on May 24, 1967, while the cargo was still enroute from Tripoli, Cummins accepted sight drafts with the clean bill of lading attached, and agreed to pay them at six-month intervals over two years.
 
 
 5
 When the cargo was discharged at Houston, it was damaged. Although Cummins claimed a constructive total loss under Underwriters' policy of insurance, the marine surveyors employed by Cummins denied that the cargo was a constructive total loss, and estimated the damage at between $10,690 and $12,500. A construction company executive, Mr. L. J. Howard, testified by deposition that the damage amounted to "seventy-five percent of the cost of the building"; but later in the deposition, Howard stated that the seventy-five percent figure did not represent a monetary estimate of the cost of repairs or replacement, but was only an estimate of the number of components that had suffered any damage, ranging from minor damage to complete destruction. In addition, a marine surveyor employed by Hansa estimated the maximum damage at $20,000. Cummins did not attempt to repair or replace the damaged components, and was able to salvage them for only $11,000, in mid-1969.
 
 
 6
 After awarding judgment for Cummins, the trial court computed damages by multiplying the revised sale price of the building ($50,307.60) by seventy-five percent (the figure supplied by Mr. Howard), and by subtracting from the resulting figure the $11,000 in proceeds from the salvage sale. Judgment was entered for $26,730.70, together with $500 incidental expenses, plus interest and costs. On appeal, Hansa challenges the determination of the liability question favorably to Cummins, and is joined by Underwriters in contending that the damages awarded were excessive. Cummins, on the other hand, contends that the damages awarded were too low.
 
 
 7
 In order to make a burdenshifting prima facie case under the Carriage of Goods by Sea Act (COGSA), 46 U.S.C. Secs. 1300-1315, Cummins had to show receipt of the cargo by the carrier in good condition and arrival of the cargo at Houston in damaged condition. Demsey & Associates v. S. S. SEA STAR, 9th Cir. 1972, 461 F.2d 1009; Daido Line v. Thomas P. Gonzalez Corp., 9th Cir. 1962, 299 F.2d 669; Mamiye Bros. v. Barber Steamship Lines, Inc., S.D.N.Y.1965, 241 F.Supp. 99, aff'd, 2d Cir., 360 F.2d 774, cert. denied, 385 U.S. 835, 87 S.Ct. 80, 17 L.Ed.2d 70 (1966). The damaged condition of the cargo upon its outturn at Houston is not questioned; and the clean bill of lading covering the cargo shipped on the GOLDENFELS is sufficient proof, for purposes of Cummins' prima facie case, of receipt of the cargo by the carrier in good condition. Demsey, supra; Daido Line, supra. Although Hansa argues that Gargour & Fils, who actually issued the bill of lading on a Hansa form and who signed it, had no authority to do so from the master of the GOLDENFELS, the master's testimony contains no suggestion that Gargour & Fils had no authority to issue the bill of lading.
 
 
 8
 Hansa attempted to rebut this prima facie showing by offering evidence that the cargo had suffered extensive damage through improper stowage and exposure to the elements at Tripoli before being loaded aboard the GOLDENFELS, but the trial judge refused to consider any evidence of pre-shipment damage. In defense of this ruling, Cummins and Underwriters invoke the principle that a carrier is estopped from impeaching a clean bill of lading in a suit by one who has given value in reliance on the bill of lading. See, e. g., Pacific Micronesian Lines, Inc. v. New Zealand Insurance Company, 9th Cir. 1966, 366 F.2d 333; The CARSO, 2d Cir. 1931, 53 F.2d 374. Cummins claims that it gave value in reliance on the bill of lading when, on May 24, 1967, while the cargo was still enroute to Houston, it accepted sight drafts with the clean bill of lading attached.
 
 
 9
 In support of its claim that this principle of estoppel does not apply to the instant case, Hansa advances three arguments. First, it contends that Gargour & Fils was acting as Cummins' agent in arranging for re-shipment aboard the GOLDENFELS and that Gargour & Fils' knowledge of the condition of the cargo when it was loaded aboard the vessel is attributable to Cummins as principal. The record, however, does not support this assertion. It is not clear exactly whose agent Gargour & Fils was. In a March 29, 1967, letter to Cummins, Taylor Woodrow referred to Gargour & Fils as "the Tripoli agents of the steamship company [Transmarin] which carried the [building] on the outward shipment," and it is conceivable that Gargour & Fils was Hansa's Tripoli agent as well. It is clear, however, that Gargour & Fils acted on instructions from Taylor Woodrow, not from Cummins. Secondly, Hansa points out that the terms of Mid-East's contract with Taylor Woodrow were "C.I.F.-Tripoli," and that Mid-East thus took title to the prefabricated building in London during February 1967. The thrust of this argument is somewhat unclear. On the one hand, Hansa may be arguing that Cummins, through its forty-nine percent control of Mid-East, took title to the building in February 1967, and thus could not have relied on the clean bill of lading in May 1967, when it accepted the sight drafts. On the other hand, Hansa may be pointing out that the re-shipment contract between Taylor Woodrow and Cummins contained the same C.I.F. term as was present in the Taylor Woodrow-Mid-East contract, and thus that Cummins took title to the building in Tripoli, prior to the issuance and negotiation of Hansa's bill of lading. Neither of these arguments, however, is relevant to a determination of Cummins' rights as against the carrier, because a C.I.F. term merely allocates the risk of loss of goods in transit as between the buyer and the seller (Taylor Woodrow). Gilmore & Black, The Law of Admiralty, 96, 97 (1957).
 
 
 10
 Thirdly, Hansa contends that Cummins unconditionally obligated itself to pay Taylor Woodrow for the building on March 30, 1967, that Cummins actually paid Taylor Woodrow the twenty-five percent down payment on April 24, 1967, and therefore Cummins did not change its position in reliance on the clean bill of lading by accepting the sight drafts approximately one month later. This argument, however, overlooks the fact that in a sale such as this one, requiring payment against documents, the purchaser's unconditional obligation to pay for the goods does not arise until presentment of drafts with a bill of lading attached. Uniform Commercial Code Sec. 2-320(4); Gilmore & Black, supra at 99-104. And although Cummins did pay the twenty-five percent down payment before issuance or negotiation of the bill of lading, it had no reason at that time to believe that the cargo would be otherwise than in good order and condition.
 
 
 11
 Accordingly we hold that Cummins, like the consignees in The CARSO, supra, gave value in reliance on the bill of lading when, in May 1967, it accepted the sight drafts with the clean bill of lading attached. Hansa was therefore estopped from attempting to show preshipment damage; and because Hansa did not carry its burden of disproving negligence or unseaworthiness or of establishing one of the exceptions to liability under COGSA, we hold that the trial court properly resolved the question of liability favorably to Cummins.
 
 
 12
 We turn briefly to the question of damages. The basis for the trial court's computation was Mr. Howard's statement that the damages amounted to "seventy-five percent of the cost of the building." The trial court multiplied this percentage by the invoice cost of the building in London, roughly $50,000, and subtracted the $11,000 in salvage sale proceeds from the resulting amount, yielding a net recovery of roughly $27,000 (plus incidental expenses, interest, and costs). In our view, this method of computing damages was erroneous, reflecting a misinterpretation of Mr. Howard's testimony. As Mr. Howard later explained, the seventy-five percent figure did not represent a monetary estimate of the extent of the damage or the cost of repair or replacement. Rather, it was an estimate of the number of components, by quantity, that had suffered some damage, from minor damage to complete destruction. Thus, the percentage figure was not intended to serve as the basis for computation of money damages.
 
 
 13
 At the same time, we must reject Cummins' claim that the cargo was a constructive total loss, even under the liberal American rule that a constructive total loss occurs if costs of repair or replacement exceed one-half the value of the cargo. Gilmore & Black, supra at 77. Aside from Mr. Howard's seventy-five percent figure, which, as we have seen, cannot be translated into a monetary damage estimate, the trial produced estimates of repair and replacement costs ranging from $10,690 to a maximum of $20,000. Cummins offered evidence that the sound value of the components in 1967 was $41,275; that the invoice cost was $50,307.60; and that the insured value was $55,326.19. It is apparent that the highest meaningful estimate of damage ($20,000) did not exceed one-half of even the lowest of these valuations ($41,275).
 
 
 14
 We therefore remand the case for redetermination of damages. Upon remand, the trial court should apply the long-settled rule that the measure of damages is the difference between the market value of the cargo in sound condition in Houston on the date the GOLDENFELS arrived (June 26, 1967), and the market value of the damaged cargo in Houston at that time. See, e. g., Encyclopaedia Brittanica, Inc. v. S.S. HONG KONG PRODUCER, 2d Cir. 1969, 422 F.2d 7, Holden v. S.S. KENDALL FISH, 5th Cir. 1968, 395 F. 2d 910; Atlantic Mutual Insurance Company v. Poseidon Schiffahrt, 7th Cir. 1963, 313 F.2d 872. Absent other evidence of the market value of the damaged cargo in Houston on the date of outturn, the proceeds of the salvage sale may be taken as establishing the market value. If no market for the cargo in sound condition existed in Houston on or about June 26, 1967, then Cummins is entitled to the reasonable cost of repairs.
 
 
 15
 Affirmed in part; reversed and remanded in part.