SUMITOMO CORPORATION OF AMERICA, Plaintiff,

v.

M/V SAINT VENTURE, etc., et al., Defendants.

No. 85–1888–CIV–T–17.

United States District Court, M.D. Florida, Tampa Division.

April 19, 1988.

G.J. Rod Sullivan, Jacksonville, Fla., for plaintiff.

Robert E. Warren, Jacksonville, Fla., for defendants.

## MEMORANDUM OPINION

KOVACHEVICH, District Judge.

This matter came on for trial on March 2, 1988, before this Court, sitting without a jury. This is an action for damages to a cargo of galvanized steel pipe imported by Plaintiff and shipped, in part, by Defendant Hyundai Merchant Marine Co. Ltd.'s (Hyundai) vessel M/V Hyundai # 3.

The complaint in this cause of action names as Defendants the vessel M/V Saint Venture, her owners or operators; Serene World Liners, Ltd. (Serene World); the vessel M/V Hyundai # 3, her owner or operator Hyundai Merchant Marine Co., Ltd.

Neither vessel was ever attached or otherwise brought within the jurisdiction of the Court. Accordingly, the vessels will be dismissed as defendants in the action.

Serene World Liners, Ltd., although served with process, failed to appear and a default was entered against them on April 11, 1986, and corrected on May 20, 1986. No final judgment was entered against Serene World Liners, Ltd. At trial before this Court on March 2, 1988, the only Defendant to appear and defend against this action was Hyundai Merchant Marine Co., Ltd.

After consideration of the testimony, exhibits, arguments of counsel, and post-trial pleadings, the Court makes the following findings of fact and conclusions of law. To the extent any finding might constitute a conclusion of law, it is adopted as such. Conversely, to the extent any conclusion of law constitutes a finding of fact, it is adopted as such. At this point, the Court would like to note its pleasure, at having appeared before it, such professional, competent counsel, well representing their parties and the issues which are for the Court's consideration.

## FINDINGS OF FACT

1. Plaintiff, Sumitomo Corporation of America (Sumitomo), is, among other things, an importer of steel to the United States.

2. Defendant, Hyundai Merchant Marine Co., Ltd., is a foreign corporation, whose principal place of business is Ulsan, South Korea. Defendant is the owner of the M/V Hyundai # 3, a general ship, employed in the common carriage of merchandise by water for hire.

3. In April or May, 1984, Plaintiff contracted with U.S. Wholesale Fence (U.S. Fence), Tampa, Florida, for the purchase of galvanized steel pipe pursuant to purchase order numbers 5333–T–84 and 5334–T–84. (Pl.Ex. 4). The terms of the sale were CIF (cost, insurance, freight) to Tampa, Florida, duty paid. (Depo. A. Banno, pg. 5). The pipe was scheduled to be delivered to U.S.

Fence on or about February 15, 1985. (Def.Ex. 7).

4. The galvanized steel pipe was manufactured by Thai Steel Pipe Industry Company, Ltd. (Thai Steel), Bangkok, Thailand. The pipe is known in the industry as a "heavy wall specification" type product. It is generally purchased and used for specification situations, such as fence tubing to be used along interstate highways, for municipalities, or in construction of prisons where stringent manufacturing specifications are applicable.

5. The sales contract between Plaintiff and U.S. Fence contained a specific condition exempting Plaintiff from responsibility for "white rust" in excess of ten percent (10%) of the invoice value. (Def.Ex. 7).

6. On or about December 18, 1984, the galvanized pipe, 385 bundles, were loaded on to the M/V Saint Venture in Bangkok, Thailand. Serene Shipping Agencies, Ltd. (Serene Shipping), issued bill of lading BK/TAM–01, as agents of Serene World, the carrier. The front side of the bill of lading was attached to the complaint and represents the contract sued on.

7. The face of the bill of lading shows:

  a. Thai Steel Pipe Industry of Bangkok, Thailand as shipper.

  b. Sumitomo Corporation of America, New York, New York as consignee and notify party.

  c. Port of Loading as Bangkok.

  d. "Saint Venture" V.2/84 as vessel/voyage no.

  e. Mobile as port of discharge.

  f. Tampa, USA as final destination and place of delivery.

  g. Manaco International Forwarders, Inc., Fort Lauderdale, Florida as delivery agents.

  h. The printed portion of the bill of lading provides "RECEIVED in apparent good order and condition except as otherwise noted ..." (Def.Ex. 9).

No other facts are known as to the relationship between Thai Steel, Plaintiff, and Serene World Liners.

8. On or about December 23, 1984, the cargo was discharged from the M/V Saint Venture in Singapore. No evidence has been presented regarding the circumstances of the discharge, whether or not it was with the consent of the parties or as to the care and condition of the cargo upon discharge.

9. On January 17, 1985, Hyundai Merchant Marine Co., Ltd., issued bill of lading, No. SGMB–23, for the "TRANSHIPMENT CARGO EX 'SAINT VENTURE' ARRIVED 23/12/84 FROM BANGKOK" and the cargo was loaded onto the vessel Hyundai # 3. The face of the bill of lading showed:

  1. Cremona Engineering & Trading PTE, Ltd. (Cremona Engineering) of Singapore as shipper.

  2. Manaco International Forwarders, Inc. (Monaco Forwarders) of Port Everglades, Florida as consignee and notify party.

  3. Singapore as port of loading.

  4. Hyundai No. 3 as ocean vessel.

  5. Mobile as port of discharge.

  6. In the upper right corner, in relevant part, "SHIPPED on board the goods ... in apparent good order and condition unless otherwise stated hereon,

    ...

In accepting this Bill of Lading, the merchant expressly accepts and agrees to all its stipulations appearing on the face and back, hereto, whether written, stamped, printed or otherwise incorporated, as fully as if they were all signed by the merchant.

The face of the bill of lading was "clean", in that it contained no specific or noted exceptions to the good order and condition of the cargo. (Pl.Ex. 5a).

10. The reverse side of the bill of lading contained the following relevant terms:

  1. DEFINITIONS

    The following words both on the face and back hereof have the meanings hereby assigned:

    (a) "Carrier" means the party on whose behalf this Bill of Lading has been signed.

(b) "Merchant" includes the Shipper, Consignee, Owner and Receiver of the Goods and the Holder of the Bill of Lading ...

3. IDENTITY OF CARRIER

The contract evidenced by the Bill of Lading is between the Merchant and the owner or demise charterer, as the case may be, of the Vessel named herein (or substitute) ...

19. IRON, STEEL, METAL GOODS

Any statement hereon that iron, steel, or metal goods of any description have been shipped in apparent good order and condition does not involve any admission by the Carrier as to the absence of dent, bent, rust, oxidation, corrosion or fresh water damage or other deterioration, for all of which the Carrier accepts no responsibility. (Def.Ex. 31 and Pl.Ex. 5B).

11. No evidence was presented as to Cremona Engineering, who it is or was, who it represented, and how it ended up with the cargo of galvanized pipes. However, evidence was presented to show that Manaco Forwarders, the consignee and notify party, was the United States agent for Serene Shipping. (Depo. M. Cohen, pgs. 5–6). Manaco Forwarders was identified as the "delivery agents" on the Serene World bill of lading of December 18, 1984. (Def.Ex. 9).

12. The M/V Hyundai #3 arrived in Mobile, Alabama on or about March 17, 1985. Ryan–Walsh Stevedoring Company, Ltd. (Ryan–Walsh) was the discharging stevedore in Mobile. Ryan–Walsh unloaded only a portion of the total cargo in Mobile, approximately 167 bundles of the 385 bundles of galvanized pipe. (Pl.Ex. 6). The reasons for the partial discharge have not been clearly established. Melvin Cohen's testimony was that *he had been informed* that it was due to excessive rains; the hearsay was unsubstantiated by direct evidence.

13. The vessel proceeded to New Orleans, Louisiana, where on or about March 27, 1985, the remaining bundles, approximately 218, were discharged from the Hyundai. The bundles of pipe were transported from New Orleans back to the Mobile port by Schedule Truck Lines (Schedule). The transportation from New Orleans took place during the period March 28 to April 12, 1985. (Def.Ex. 24).

14. Defendant introduced into evidence the dock receipts evidencing the exchange between Ryan–Walsh and Schedule of those bundles. (Def.Ex. 24). Review of the docket receipts show exceptions with regard to approximately 20 pieces being bent. No notations were made in regard to rust or white oxidation.

15. Manaco Forwarders were retained by Serene World to arrange for the transportation of the galvanized pipe shipment from Mobile to Tampa, Florida. (Depo. M. Cohen, pg. 9). Mr. Cohen contracted with Leonard Brothers Trucking Company (Leonard Bros.) to transport the cargo to Tampa. (Depo. M. Cohen, pg. 20).

16. Leonard Bros. picked up the pipe from Ryan–Walsh in Mobile during the period April 9 to April 25, 1985. (Pl.Ex. 6). Piecemeal, the entire 385 bundles were taken by Leonard Bros. to their facilities in Pensacola, Florida. The checker's reports exchanged between Ryan–Walsh and Leonard Bros.' truckers noted various dents and bending to the pipe, approximately 56 pieces, but no notations were made on these forms regarding white oxidation or rust. (Pl.Ex. 6).

17. The trip to Pensacola from Mobile was a one day trip, but Leonard Bros. lacked a sufficient number of trucks to complete transportation of the entire cargo to Tampa at the same time. (Depo. T. Leonard, pgs. 6, 8). The trip to Tampa, from Pensacola, is approximately 480 miles. (Depo. T. Leonard, pg. 27).

18. The cargo was stored in Leonard Bros.' yard while waiting for trucks to transport it to its final destination in Tampa. Some of the bundles were off-loaded and stacked on the ground, while others remained secured on trailer beds. All were kept in open storage. (Depo. T. Leonard, pg. 12–14).

19. During the time the cargo was at the Pensacola site the employees of Leon-

ard Bros. noticed damage to the galvanized pipe. (Depo. T. Leonard, pg. 6). The various bills of lading of Leonard Bros. contain notations of white discoloration, red rust, stains, abrasions, donnage, marks, denting, and bending. (Pl.Ex. 6).

20. Leonard Bros. hired Crawford and Company (Crawford) to survey the damaged pipe. (Depo. T. Leonard, pg. 6). The insurance adjuster who was called in to do the damage investigation was Pamela N. Mayo. (Depo. P. Mayo, pg. 5). Ms. Mayo surveyed the pipe at the Leonard Bros. yard, took photographs, and had a chemical analysis performed. (Depo. P. Mayo, pgs. 5–6). Ms. Mayo observed that some pipes were bent, some had a white substance coating them, and some had red rust colored marks. (Depo. P. Mayo, pgs. 8, 12).

21. The chemist's analysis was performed by Pioneer Laboratory, Inc. (Depo. W. Bowers, pgs. 3–4). Samples of the white substance from the pipes were taken by a field man and brought into the lab. The analysis was done by the supervisor of the inorganic section; she did what is known as an unknown assay. (Depo. W. Bowers, pgs. 4, 7).

22. The majority of the chemical composition of the white substance was zinc oxide. Zinc oxide is the result of the oxidation of the zinc formed by oxygen and a corrosive environment; one such corrosive environment is sea water. (Depo. W. Bowers, pgs. 8–9). The analysis also revealed the presence of sodium chloride, 1.96% of the chemical composition was sodium chloride. (Depo. W. Bowers, pg. 9). Sodium chloride is present in sea water, as well as in the atmosphere or in rain near salt water ports. (Depo. W. Bowers, pgs. 10–12).

23. The shipment of galvanized pipe was transported by Leonard Bros. from Pensacola to Tampa between April 11 and April 29, 1985, for delivery to U.S. Fence. Upon receipt, U.S. Fence noted damage to almost all of the bundles of pipe; the damage note included bending, denting, wire rope abrasions, white rust, and red rust, and donnage marks. (Pl.Ex. 6).

24. U.S. Fence notified Sumitomo of the damage and Sumitomo retained a marine surveyor, S.J. Parry of Toplis and Harding, to survey the damage. Captain Parry was a surveyor of more than 40 years experience, who had surveyed more than 500 cargos of steel pipe. (Depo. S. Parry, pgs. 4, 20).

25. Captain Parry stated that shipping galvanized pipe in unprotected bundles and storing them in the open is customary. (Depo. S. Parry, pg. 26). The shipment was very heavily oxidized, corroded, and with red rust present. The strapping and metal identification tags were heavily rusted. (Depo. S. Parry, pg. 7). Captain Parry found white oxidation in lines, which he considered to be the result of moisture being retained between the pipes as they lay together in the bundles, and, which he felt indicated the entire cargo had had water dropped on it. (Depo. S. Parry, pg. 14).

26. Captain Parry performed some tests and sent samples to chemists for conformation. The test with a solution of nitrate of silver revealed no chlorides present, indicating contact with fresh water. The chemist report also indicated contact with fresh water. Captain Parry felt the abrasion of the pipes was caused by either a wire sling or wire lashing. (Depo. S. Parry, pg. 15, Pl.Ex. 11).

27. Captain Parry and U.S. Fence agreed to a depreciation figure for the damage to the pipe, which was 25% of the sound market value. The depreciation figure was later broken down to attribute 10% to white rust, oxidation and corrosion; 7.5% to red rust corrosion; 5% to wire rope abrasions; and 2.5% to bending, denting, and flattening of the ends of the pipe. (Depo. S. Parry, pg. 25, Pl.Ex. 11).

28. Captain Parry felt the damage appeared to be of "quite long standing." He could not pinpoint when was the most likely time for the damage. (Depo. S. Parry, pgs. 36–38).

29. Sumitomo gave an allowance to U.S. Fence in the amount of $62,970.49 as a result of the damage to the pipe.

30. Sumitomo Marine and Fire Insurance (Sumitomo Fire), the insurer of the

cargo, remitted to Sumitomo a check for $67,042.75. (Depo. C. McLarty, pg. 15).

31. Sumitomo Fire is a separate corporation from Sumitomo. (Depo. T. Okubo, pg. 4).

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties and the subject matter pursuant to 28 U.S.C. § 1333.

■ 2. Upon the issuance of the bills of lading, the loading, handling, stowage, carriage, custody, care, and discharge of the goods herein became subject to 46 U.S.C. §§ 1300, *et seq*, the Carriage of Goods by Sea Act (COGSA). The COGSA, 46 U.S.C. § 1303 provides for the responsibilities and liabilities of carrier and ship. In relevant part it states:

(3) After receiving the goods into his charge the carrier, or the master or agent of the carrier, shall, on demand of the shipper, issue to the shipper a bill of lading showing among other things— ...

(c) The apparent order and condition of the goods ...

(4) Such a bill of lading shall be prima facie evidence of the receipt by the carrier of the goods as therein described in accordance with paragraphs (3)(a), (b), and (c), of this section: Provided, That nothing in this chapter shall be construed as repealing or limiting the application of any part of sections 81 to 124 of Title 49 ...

(6) Unless notice of loss or damage and the general nature of such loss or damage be given in writing to the carrier or his agent at the port of discharge before or at the time of the removal of the goods into the custody of the person entitled to delivery thereof under the contract of carriage, such removal shall be prima facie evidence of the delivery by the carrier of the goods as described in the bill of lading. If the loss or damage is not apparent, the notice must be given within three days of delivery.

## BURDEN OF PROOF

■ 3. To prevail under COGSA Plaintiff must establish a *prima facie* case of liability, by proving that the carrier received the cargo in good condition and that the cargo was damaged while in the custody of Defendant, and upon delivery by the carrier at its destination. *Blasser Bros. v. Northern Pan–American Line*, 628 F.2d 376 (5th Cir.1980).

■ 4. A bill of lading is *prima facie* evidence that the carrier received the goods as described therein and creates a rebuttable presumption that the goods were delivered to the carrier in good condition. *Id.*, at 381. If the Plaintiff makes a showing that the cargo was delivered to the carrier in good condition but discharged in a damaged condition, the burden shifts to the carrier to show it did nothing to change the condition of the cargo up to the time of the discharge or that the cause of the damage was either not due to its negligence or was a result of an excepted clause under COSGA. *American Tobacco Co. v. Katingo Hadjipatera*, 194 F.2d 449 (2nd Cir. 1951).

■ 5. The showing sufficient to establish a *prima facie* case regarding receipt by carrier in good condition is satisfied by the introduction into evidence of a "clean" onboard bill of lading. *Cummins Sales & Service, Inc. v. London & Overseas Insurance Co.*, 476 F.2d 498, 500 (5th Cir.1973). Ordinarily this estops the carrier from asserting that the cargo, which is readily observable, was not in good order and condition when received. *Cummins*, 476 F.2d 498. Plaintiff must prove the actual condition on discharge and the extent of damages with reasonable specificity.

■ 6. It is the carrier's lawful right to put the Plaintiff to its proof and for the defense to stand upon the insufficiency of the evidence of delivery of the cargo in good condition and/or discharge of the cargo in damaged condition. If Plaintiff's proof is insufficient in either regard, the carrier need not go forward with a showing of the actual care provided the goods.

*Compagnie de Navigation v. Mondial United Corp.,* 316 F.2d 163 (5th Cir.1963).

## REAL PARTY IN INTEREST AND PRIVITY OF CONTRACT

7. In the first instance, Defendant asserts that Plaintiff is not the real party in interest and that no judgment should be entered in its favor. As stated by Defendant, Mr. Clarence McLarty of Sumitomo Fire testified that Sumitomo executed a subrogation agreement in favor of Sumitomo Fire giving them the right to subrogate the claim. (Depo. C. McLarty, pg. 165–16, Pl.Ex. 17).

8. Defendant contends that there is no evidence that the claim was brought with the authority of Sumitomo Fire and that such cannot be assumed. The Court, upon review of the file, is satisfied that it is only post-trial that this issue has been addressed by both parties in their post-trial pleadings.

■ 9. Subrogation is the substitution of one person in the place of another with reference to a lawful claim or right, so that he who is substituted succeeds to the rights of the other in relation to the claim and its rights, remedies, or securities. *Black's Law Dictionary* (1957).

■ 10. A defense of failure to join an indispensable party may be made at trial on the merits. Rule 12(h)(2), Fed.R. Civ.P. An indispensable party is one claiming an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may "leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of a claimed interest." The real party in interest is the person who is actually and substantially interested in the subject-matter, as distinguished from one who only has a nominal, formal, or technical interest in or connection to the matter. *Black's Law Dictionary* (1957).

■ 11. Upon order of this Court, dated March 29, 1988, Plaintiff submitted a Ratification of Commencement of Action, by which Sumitomo Marine ratifies the commencement of the action by Sumitomo. The Court accepts the ratification, and finds that Sumitomo Corporation of America is a proper party to bring the instant action.

12. The next issue Defendant raises is whether or not Plaintiff enjoys privity of contract with Defendant to bring this action in contract. Defendant is not a party to the original bill of lading between Serene World and Sumitomo, which is the contract sued upon in the complaint filed December 13, 1985. (Pl.Ex. 2).

13. Therefore, the question is whether or not Plaintiff is in privity to the contract (bill of ladings) between Hyundai and Cremona and Manaco Forwarders. (Pl.Ex. 5). There is no evidence as to who Cremona represented in any of the transactions here. The evidence does show that Manaco Forwarders was the agent of Serene Shipping.

■ 14. Privity of contract is that connection or relationship which exists between two or more contracting parties; it is essential to the maintenance of an action on any contract that there should subsist a privity between the plaintiff and defendant in respect to the matter sued upon. *Black's Law Dictionary* (1957).

■ 15. Plaintiff relies on the terms of the bill of lading, which defines "merchant" to include the owner of the goods and states that the bill of lading is between the merchant and the owner or demise charterer. (Pl.Ex. 5b). The Court finds sufficient privity of contract to allow the maintenance of Plaintiff's cause of action.

## CLEAN BILL OF LADING–RUST CLAUSE

16. Defendant asserts that the bill of lading issued by Hyundai is not a "clean" bill of lading and does not establish a *prima facie* showing of good condition on receipt by the carrier Hyundai, which would normally estop Defendant from denying receipt in good condition. This assertion is based on Clause 19 of the bill of lading terms and conditions.

17. Clause 19 states that representation of good order and condition on the front side does not apply to steel products, as far as representing they were free from rust, oxidation, dents, bends, or freshwater damage.

18. The validity of similar rust clause, known as "retla rust clauses", have been considered and found to be sustainable in several cases. *Tokio Marine & Fire Ins. Co. v. Retla Steamship Co.*, 426 F.2d 1372 (9th Cir.1970); *Dorsid Trading Co. v. S/S Rose*, 343 F.Supp. 617 (D.C.TX 1972); *Okura & Co. v. M/V Euroasia Concorde*, Case No. 83–592–CIV–T–15 (March 27, 1985).

■ 19. Plaintiff asserts that the so-called "retla rust clause" herein does not conform to the standard of law set out in these cases, because it was not in bold print on the front of the bill of lading and did not offer a substitute bill of lading. The Court having considered the arguments and case law finds that as to the attempted disavowment, Clause 19 is not a valid "retla rust clause".

20. Clause 19 attempts to deny liability for all damage to steel products, including denting, bending and the corrosive damages such as rust. This Clause, unlike the clause in *Tokio*, 426 F.2d 1372, is buried in the fine print, at 1378, fn. 10. The clause contains no offer to substitute the bills of lading to show damage appearing on mate or tally clerk receipts. The Court finds Clause 19 to be void and of no effect in accordance with 46 U.S.C. § 1303(8).

■ 21. The Court finds Plaintiff has established a *prima facie* case that the goods were delivered to Defendant in good condition, by means of the "clean" bill of lading. Defendant has not presented any evidence to rebut the presumption of good order and condition upon receipt on the Hyundai # 3.

## LIABILITY OF DEFENDANT

22. The next issue the Court must address is whether or not Plaintiff has carried its burden of establishing that the cargo was damaged when it was discharged from the vessel Hyundai # 3.

23. A portion of the cargo, about 167 bundles, was unloaded from the Hyundai in Mobile, Alabama on or about March 17, 1985. The discharging stevedore noted some bent pieces; there was no notation at that time regarding rust or oxidation. These bundles of pipe were transported from Mobile to Pensacola over a period of time from April 9 to April 25, 1985; again, no note was made of rust or oxidation, although the truckers noted dents and bending. During the period of time that they were in Pensacola, it was observed that the pipe was damaged, including white discoloration, red rust, stains, abrasions, donnage, marks, denting, and bending.

24. The remainder of the cargo, approximately 218 bundles, was taken to New Orleans, Louisiana; they were discharged on or about March 27, 1985. During the period March 28 to April 12, 1985, these bundles were transported back to Mobile and became part of the entire cargo that was thereafter transported to Pensacola. There were notations made at the New Orleans dock regarding the condition of the pipe. The first note of damage to this portion of the cargo was when it reached Pensacola as part of the entire cargo and as noted in paragraph 23 above.

25. The entire cargo was noted by the marine surveyor and insurance surveyor to be damaged in essentially equal proportions. The marine surveyor, Captain Parry, was of the opinion that the damage was freshwater damage. Captain Parry also postulated, based on his experience, that the white oxidation, which was in horizontal lines on the pipe, was a result of water being retained between the pipes as they lay together in bundles, and, which he felt indicated the entire cargo had had water dropped on it. Captain Parry stated the rust damage was of long standing and that it happened "somewhere during the voyage of importation." The Court accepts the testimony of Captain Parry.

■ 26. The Court finds that Plaintiff has established a *prima facie* case, which Defendant has failed to sufficiently rebut, and that Defendant is liable for damages to this cargo of galvanized steel pipe.

27. As stated previously, the cargo was delivered to Defendant's vessel in "good condition", as evidenced by the bill of lading issued January 17, 1985. The cargo arrived in a damaged condition, including rust, oxidation, and denting, in Pensacola. The *entire load* was similarly damaged as to the rust and oxidation; the plain inference is that the entire load was together when it was damaged. The entire load was together while it was on the vessel Hyundai #3 and after it arrived at Leonard Bros. yard in Pensacola, where the damage was first noted. This damage was of "long-standing"; it had happened sometime during the importation, according to Captain Parry.

DISCHARGE

28. COSGA provides loss or damage notice be given in writing as the port of discharge or within three days of delivery, if damage is not apparent. 46 U.S.C. § 1303(6). Notice of damage was not given within three (3) days of delivery to Leonard Bros., the party entitled to receive the cargo. However, because the Court has credited the testimony of Captain Parry, that the rust was of long-standing and not a result of conditions following the discharge, the Court declines to find a failure to give timely notice requiring dismissal of the claim.

DEVIATION

29. Plaintiff raises the issue of whether or not the deviation of a portion of the cargo to New Orleans makes Defendant an insurer of the cargo. Because the Court has already found Defendant liable for damages to this cargo, it is not necessary to address that issue.

DAMAGES

30. Damages for injury to cargo while in the possession of the carrier are to be computed at the difference between the fair market value of the cargo at destination in the condition in which it would have arrived but for the fault of the carrier, and, the fair market value in which it did arrive. *Interstate Steel v. S.S. Crystal Gem*, 317 F.Supp. 112 (S.D.N.Y.1970). The Court has discretion if fixing the rate of interest, allowance of interest being the general rule. *Sun Ship, Inc. v. Matson Navigation Co.*, 785 F.2d 59 (3rd Cir.1986), *O'Donnell Transportation Co. v. City of New York*, 215 F.2d 92 (2d Cir.1954).

31. Costs incurred to ascertain the nature and extent of a cargo loss are recoverable as damages. *Terman Foods, Inc. v. Omega Lines*, 707 F.2d 1225 (11th Cir.1983).

32. Defendant Hyundai Merchant Marine Company, Ltd. is liable to Plaintiff Sumitomo Corporation of America in the amount of $62,970.49 in damages to the cargo, pre-judgment interest from April 29, 1985, the date of the claim, to present at the rate of statutory rate of twelve percent (12%) per annum, survey fees in the amount of $1,038.99, and costs of litigation, to be awarded upon proper application. Accordingly, it is

ORDERED that the Clerk of the Court shall enter a final judgment for Plaintiff Sumitomo Corporation of America and against Defendant Hyundai Merchant Marine Co., Ltd., for $62,970.49 damages, pre-judgment interest at twelve percent (12%) per annum from April 29, 1985, to date of this order, $1,038.99 survey fee, and costs of the litigation, to be awarded upon proper application.